SKINNER v SQUARE D COMPANY

Docket No. 94875. Argued December 2, 1993 (Calendar No. 11).
Decided May 17, 1994. Rehearing denied *post,* 1233.

Doris L. Skinner, as personal representative of the estate of
Chester W. Skinner, deceased, and others brought a products
liability action in the Oakland Circuit Court against Square D
Company, claiming that the decedent's electrocution while
using a homemade tumbling machine was caused by a defective
switch manufactured by the defendant. The court, Fred M.
Mester, J., granted summary disposition for the defendant,
ruling that the plaintiffs had not shown as a specific issue of
fact that the switch had caused the death. The Court of
Appeals, JANSEN, P.J., and GRIFFIN, J. (MICHAEL J. KELLY, J.,
dissenting), affirmed, finding that no plausible theory was ad-
vanced regarding how the defective switch caused the accident
and that there were insufficient facts to proceed on the sepa-
rate claims of failure to insulate and failure to warn (Docket
No. 127703). The plaintiffs appeal.

In an opinion by Chief Justice CAVANAGH, joined by Justices
BRICKLEY, BOYLE, RILEY, and MALLETT, the Supreme Court *held:*

The plaintiffs failed to offer evidence from which reasonable
minds could infer that the alleged defect caused the decedent's
death. Because the defendant's motion for summary disposition
was properly supported and the plaintiffs' evidentiary response
was not adequate, the trial court correctly granted the motion.
In addition, the trial court properly dismissed the plaintiffs'
claims of failure to insulate and failure to warn.

1. A prima facie case for products liability requires proof of a
causal connection between an established defect and injury.
While the plaintiff bears the burden of proof, the evidence
produced need not positively eliminate every other potential
cause; rather, the evidence is sufficient if it establishes a logical
sequence of cause and effect, notwithstanding the existence of
other plausible theories.

2. A trial court tests the factual support of a claim when it

REFERENCES

Am Jur 2d, Products Liability §§ 273, 282; Summary Judgment
§ 26.

See ALR Index under Products Liability; Summary Judgment.

rules on a motion for summary disposition under MCR 2.116(C)(10) by considering the affidavits, pleadings, depositions, admissions, and documentary evidence. The court may not assess credibility or determine facts; instead, its task is to review the record evidence, and all reasonable inferences to be drawn from it, and decide whether a genuine issue of any material fact exists to warrant a trial. The test is whether the kind of record that might be developed, giving the benefit of reasonable doubt to the opposing party, would leave open an issue about which reasonable minds might differ.

3. In this case, the issue is cause in fact, not proximate cause, requiring a showing that but for the defendant's actions, the plaintiff's injury would not have occurred. Cause in fact must be established before proximate cause becomes a relevant issue. In products liability cases, circumstantial proof may be utilized to establish the requisite causal link between a defect and an injury; however, the mere happening of an unwitnessed mishap neither eliminates nor reduces the duty to effectively demonstrate causation. To be adequate, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation. At a minimum, a causation theory must have some basis in established fact. The plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.

4. In this case, the circumstantial evidence did not afford a reliable basis from which reasonable minds could infer that more probably than not, but for the defect in the switch, the decedent would not have been electrocuted. The record does not manifest a genuine issue of causation in fact. Thus, there was no error in the grant of summary judgment for the defendant.

Affirmed.

Justice Levin, dissenting, stated that the estate produced sufficient evidence to require submission to the jury of the question whether Skinner's death was caused by the conceded defect in design and failure to insulate the on/off switch of the tumbling machine. The plaintiff's theory that Skinner touched the electrical wires after relying on the on/off switch that erroneously indicated that the power was off is both the product of reasoned inferences from the evidence and is more probable than any other reasonable theory of causation.

Because there is substantial evidence that the tumbling machine was not operating when Skinner touched the wires, a trier of fact reasonably could conclude, without resorting to conjecture, that the electrified wires were not connected to the

tumbler when he touched them. Alternatively, if the wires were connected to the tumbling machine when Skinner touched them, the trier of fact reasonably could conclude that power was not flowing through the wires when he touched them. Further, sufficient evidence was produced to create a question of fact regarding whether Skinner relied on the on/off switch before touching the wires.

With regard to the plaintiff's claim of failure to insulate, the Court of Appeals erred in failing to advert to and consider expert and nonexpert testimony about the magnitude of the shock that Skinner was receiving, which was sufficient to create a question of fact concerning whether the uninsulated handle contributed to his death.

Justice GRIFFIN took no part in the decision of this case.

195 Mich App 664; 491 NW2d 648 (1992) affirmed.

1. PRODUCTS LIABILITY — CAUSATION — BURDEN OF PROOF.

A prima facie case for products liability requires proof of a causal connection between an established defect and injury; while the plaintiff bears the burden of proof, the evidence produced need not positively eliminate every other potential cause; rather, the evidence is sufficient if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories.

2. MOTIONS AND ORDERS — SUMMARY DISPOSITION — COURT RULES.

A trial court tests the factual support of a claim when it rules upon a motion for summary disposition by considering the affidavits, pleadings, depositions, admissions, and documentary evidence; the court may not assess credibility or determine facts; instead, its task to· review the record evidence, and all reasonable inferences to be drawn from it, and decide whether a genuine issue of any material fact exists to warrant a trial; the test is whether the kind of record that might be developed, giving the benefits of reasonable doubt to the opposing party, would leave open an issue about which reasonable minds might differ (MCR 2.116[C][10]).

3. PRODUCTS LIABILITY — CIRCUMSTANTIAL PROOF — CAUSATION — REASONABLE INFERENCES.

In products liability cases, circumstantial proof may be utilized to establish the requisite causal link between a defect and an injury; however, the mere happening of an unwitnessed mishap neither eliminates nor reduces the duty to effectively demonstrate causation; to be adequate, the circumstantial proof must facilitate reasonable inferences of causation, not mere specula-

tion; at a minimum, a causation theory must have some basis in established fact; the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.

*Nolan, Reincke, Thomsen & Villas, P.C.* (by *Lawrence P. Nolan*), for the plaintiffs.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Barbara Hughes Erard* and *Theresa M. Serra*) for the defendant.

Amicus Curiae:

*O'Leary, O'Leary, Jacobs, Mattson & Perry, P.C.* (by *John P. Jacobs*), for Michigan Defense Trial Counsel, Inc.

CAVANAGH, C.J. Plaintiffs, representatives for the decedent Chester W. Skinner, appeal from the Court of Appeals decision affirming the trial court's grant of the defendant's motion for summary disposition under MCR 2.116(C)(10). 195 Mich App 664; 491 NW2d 648 (1992). This Court granted plaintiffs' application for leave to appeal, limited to the following questions:

(1) whether the trial court erroneously determined that there were no genuine issues of material fact and that as a matter of law defendants' switch could not have caused decedent's death, thus entitling defendants to a grant of summary disposition, and (2) whether the trial court erred in dismissing plaintiffs' case without ruling on their claims regarding defendants' failure to insulate the switch's handle and defendants' failure to warn. [443 Mich 884 (1993).]

We find that the plaintiffs failed to offer evidence from which reasonable minds could infer

that the alleged defect caused the decedent's death. Because the defendant's summary disposition motion was properly supported, and the plaintiffs' evidentiary response was not adequate, we hold that the trial court correctly granted the defendant's motion. For the reasons stated by the Court of Appeals, we also hold that the trial court properly dismissed plaintiffs' claims for failure to insulate and failure to warn.

I

We borrow from the Court of Appeals accurate summary of the relevant facts in this case:

> Plaintiffs brought this products liability action against defendant, Square D Company, following the death of plaintiffs' decedent, Chester W. Skinner. Mr. Skinner was electrocuted by his own homemade tumbling machine on which he had installed a switch manufactured by defendant.
>
> *   *   *
>
> [Mr. Skinner] was in the business of cleaning and finishing metal parts. To this end, [he] routinely used a homemade tumbling machine that he had designed and built himself. Essentially, the machine consisted of a large metal drum mounted on a frame. Rough metal parts were placed inside the drum along with a quantity of abrasive detergent. An electric motor then rotated the drum in one direction to wash the parts. After allowing the drum to rotate for a period of time, the operator would reverse the direction of the tumbler and the finished parts would be ejected from the drum.
>
> Because of the way Mr. Skinner had designed the machine, reversing the direction of the drum's rotation was a dangerous task. The motor that turned the drum was controlled by a switch manufactured by defendant. Mr. Skinner had connected the Square D switch to the motor by using three wires with insulated "alligator clips" on the ends.

In order to reverse the direction of the machine, the operator was required to disconnect two of the alligator clips from the motor by hand and reverse them. For obvious reasons, it was important for the operator to make sure that the Square D switch was in the off position before disconnecting the wires from the motor.

On February 21, 1986, Mr. Skinner was in his shop, working in the room with the tumbling machines. Mrs. Skinner and two other women, Beulah McBride and Violet Whiting, were in another room, racking parts. Suddenly, the women heard Mr. Skinner cry out. They ran into the room where Mr. Skinner was, and found him standing with his hands above his head, each hand grasping an alligator clip. Electric current was passing through Mr. Skinner's body. Aware of what was happening, Mr. Skinner cried out to the women, "don't touch me!" He then freed his left hand from the alligator clip and reached for the Square D switch. Mr. Skinner threw the switch into the off position, twisted, and fell over dead. [195 Mich App 665-666.]

Plaintiffs claim that the Square D switch was defectively designed because it had a large "phantom zone" that sometimes made the switch appear to be "off" when it was actually "on." Plaintiffs assert that this defect proximately caused Mr. Skinner's death.

The defendant responds that, even assuming the switch is defective, the plaintiffs' evidence does not show that Mr. Skinner was misled by the switch when he was fatally electrocuted.[1] Following numerous depositions and written discovery requests, the defendant filed a motion for summary disposi-

[1] The defendant does not concede that the switch is defective. Rather, for purposes of this litigation, the defendant deems the alleged defectiveness to be an irrelevant issue in view of plaintiffs' inability to show causation.

tion pursuant to MCR 2.116(C)(10),[2] effectively claiming that because plaintiffs are unable to establish a genuine issue of causation, it is entitled to judgment as a matter of law.

The trial court granted the defendant's motion, ruling that the "Plaintiff has produced no evidence to show a specific fact issue to support his theory that the switch somehow caused Plaintiff's decedent's death." The Court of Appeals affirmed, over the dissent of Judge MICHAEL J. KELLY. The majority found that "at no time did plaintiffs advance a plausible theory regarding how the defective switch caused the accident." 195 Mich App 668. The Court further concluded that there were insufficient facts to proceed on plaintiffs' separate claims of failure to insulate and failure to warn.[3]

II

It is well settled under Michigan law that a prima facie case for products liability requires proof of a causal connection between an established defect and injury. *Mulholland v DEC Int'l Corp,* 432 Mich 395, 415; 443 NW2d 340 (1989). While the plaintiff bears the burden of proof, the plaintiff is not required to produce evidence that positively eliminates every other potential cause. Rather, the plaintiff's evidence is sufficient if it

---

[2] MCR 2.116(C)(10) provides:

(C) Grounds. The motion [for summary disposition] may be based on one or more of these grounds, and must specify the grounds on which it is based:

* * *

(10) Except as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law.

[3] Judge KELLY did not express any disagreement with the majority's disposition of these latter two issues.

"establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Id.*

As indicated, the defendant in the instant products liability suit argued that the plaintiffs failed to establish a genuine issue of causation, entitling it to summary judgment.

The Michigan Court Rules provide a precise description of the respective burdens that litigants must bear when a motion for summary judgment is filed pursuant to MCR 2.116(C)(10). Specifically, MCR 2.116(G)(4)[4] mandates that the party seeking summary judgment must specify the issues for which it claims there is no genuine factual dispute. Provided the moving party's motion is properly supported, MCR 2.116(G)(4) dictates that the opposing party must then respond with affidavits or other evidentiary materials that show the existence of a genuine issue for trial. If the opposing party does not so respond, the rule provides that "judgment, if appropriate, shall be entered against him or her." MCR 2.116(G)(4). In a similar fashion, this Court has explained the burden of the nonmovant as follows:

> Once a party is challenged as to the existence of the facts upon which he purports to build his case,

---

[4] MCR 2.116(G)(4) provides:

(4) A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

the sum and substance of the summary judgment proceeding is that general allegations and notice pleading are not enough. Matters upon information and belief and alleged common knowledge are not enough. *That party must come forward with at least some evidentiary proof, some statement of specific fact upon which to base his case. If he fails, the motion for summary judgment is properly granted.* [*Durant v Stahlin*, 375 Mich 628, 640; 135 NW2d 392 (1965). Emphasis added.][5]

## III

A trial court tests the factual support of a plaintiff's claim when it rules upon a motion for summary disposition filed under MCR 2.116(C)(10). *Lichon v American Universal Ins Co*, 435 Mich 408, 414; 459 NW2d 288 (1990). The court must consider the affidavits, pleadings, depositions, admissions, and documentary evidence submitted or filed in the action.[6] The court is not permitted to assess credibility, or to determine facts on a motion for summary judgment. *Zamler v Smith*, 375 Mich 675, 678-679; 135 NW2d 349 (1965). Instead, the court's task is to review the record evidence, and all reasonable inferences therefrom, and decide whether a genuine issue of any material fact exists to warrant a trial.[7]

[5] While there was no majority opinion in *Durant,* we recently reaffirmed this principle in *McCart v Thompson, Inc,* 437 Mich 109, 115; 469 NW2d 284 (1991) (" 'When properly challenged, plaintiff must establish that he has a case on the law and that *there are some evidentiary proofs to support his allegations as to any material fact*' ") (emphasis added).

[6] Specifically, MCR 2.116(G)(5) requires that the trial court examine "[t]he affidavits, together with the pleadings, depositions, admissions, and documentary evidence . . . submitted by the parties" when reviewing a motion filed under MCR 2.116(C)(10).

[7] As we noted in *Durant* at 646-647, "there is a great difference between an inquiry to determine whether or not there is an issue of fact and a trial to decide a disputed issue of fact."

To determine if a genuine issue of material fact exists, the test is "whether the kind of record which might be developed, giving the benefit of reasonable doubt to the opposing party, would leave open an issue upon which reasonable minds might differ." *Farm Bureau Mutual Ins Co v Stark,* 437 Mich 175, 184-185; 468 NW2d 498 (1991).

Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. *Moll v Abbott Laboratories,* 444 Mich 1, 27, n 36; 506 NW2d 816 (1993).

Applying these rules, we find that the defendant fulfilled its burden under MCR 2.116(G)(4) when it effectively indicated in its motion that there was no genuine dispute regarding causation. In addition, we conclude that the plaintiffs failed to satisfy their duty because, for the reasons set forth below, their proofs did not establish a genuine issue of causation.

IV

So as to avoid any possible confusion, we make plain that the specific causation issue before the Court in this case is one of cause in fact, and not legal cause or "proximate cause." That said, we also take this opportunity to clarify what is typically required to establish cause in fact.

Under Michigan products liability law, as part of its prima facie case, a plaintiff must show that the manufacturer's negligence was the *proximate cause* of the plaintiff's injuries. *Brisboy v Fibreboard Corp,* 429 Mich 540, 547; 418 NW2d 650 (1988) (emphasis added). We have previously explained that proving proximate cause actually entails proof of two separate elements: (1) cause in

fact, and (2) legal cause, also known as "proximate cause." *Moning v Alfono,* 400 Mich 425, 437; 254 NW2d 759 (1977).

The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. Prosser & Keeton, Torts (5th ed), § 41, p 266. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. *Moning* at 439. See also *Charles Reinhart Co v Winiemko,* 444 Mich 579, 586, n 13; 513 NW2d 773 (1994). A plaintiff must adequately establish cause in fact in order for legal cause or "proximate cause" to become a relevant issue. We find that the plaintiffs here were unsuccessful in showing a genuine issue of factual causation. Accordingly, we need not and do not address legal cause or "proximate cause" in this case.

Because no one was present in the shop with the decedent immediately before the accident, the plaintiffs had to rely on circumstantial evidence to establish that the alleged defective switch was the cause in fact of the decedent's death. This Court has repeatedly recognized that plaintiffs may utilize circumstantial proof to show the requisite causal link between a defect and an injury in products liability cases. *Mulholland* at 415; *Holloway v General Motors Corp (On Rehearing),* 403 Mich 614, 618; 271 NW2d 777 (1978); *Schedlbauer v Chris-Craft Corp,* 381 Mich 217, 223; 160 NW2d 889 (1968); *Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965).

While plaintiffs may show causation circumstantially, the mere happening of an unwitnessed mishap neither eliminates nor reduces a plaintiff's duty to effectively demonstrate causation:

That there was no eyewitness to the accident does not always prevent the making of a possible issue of fact for the jury. But the burden of establishing proximate cause . . . always rests with the complaining party, and no presumption of it is created by the mere fact of an accident. [*Howe v Michigan C R Co,* 236 Mich 577, 583-584; 211 NW 111 (1926), cert den 274 US 738 (1927).]

To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation. In *Kaminski v Grand Trunk W R Co,* 347 Mich 417, 422; 79 NW2d 899 (1956), this Court highlighted the basic legal distinction between a reasonable inference and impermissible conjecture with regard to causal proof:

"As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

We want to make clear what it means to provide circumstantial evidence that permits a reasonable inference of causation. As *Kaminski* explains, at a minimum, a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substan-

tial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.[8]

We have consistently applied this threshold evidentiary standard to a plaintiff's proof of factual causation in negligence cases:[9]

> "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." [*Mulholland* at 416, n 18, quoting Prosser & Keeton, Torts (5th ed), § 41, p 269.]

> The mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two. [*Jordan v*

[8] However, where several factors combine to produce an injury, and where any one of them, operating alone, would have been sufficient to cause the harm, a plaintiff may establish factual causation by showing that the defendant's actions, more likely than not, were a "substantial factor" in producing a plaintiff's injuries. *Brisboy* at 547. See also Prosser & Keeton, Torts (5th ed), § 41, p 266.

[9] While some of these cases involve a motion for a directed verdict, the test regarding the sufficiency of causal proof is essentially the same in the contexts of summary judgments and directed verdicts, namely, whether reasonable minds, taking the evidence in a light most favorable to the nonmovant, could reach different conclusions regarding a material fact. Accord *Anderson v Liberty Lobby, Inc,* 477 US 242; 106 S Ct 2505; 91 L Ed 2d 202 (1986) (" 'The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.' In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") *id.* at 251-252 (citations omitted).

*Whiting Corp,* 396 Mich 145, 151; 240 NW2d 468
(1976).]

There must be substantial evidence which forms
a reasonable basis for the inference of negligence.
There must be more than a mere possibility that
unreasonable conduct of the defendant caused the
injury. We cannot permit the jury to guess . . . .
[*Daigneau v Young,* 349 Mich 632, 636; 85 NW2d
88 (1957). Citations omitted.]

Something more should be offered the jury than
a situation which, by ingenious interpretation,
suggests the mere possibility of defendant's negli-
gence being the cause of the injury. [*Howe* at
584.][10]

In light of the above pronouncements, we concur
with the observation made in 57A Am Jur 2d,
Negligence, § 461, p 442:

All that is necessary is that the proof amount to
a reasonable likelihood of probability rather than
a possibility. The evidence need not negate all
other possible causes, but such evidence must ex-
clude other reasonable hypotheses with a fair
amount of certainty. Absolute certainty cannot be
achieved in proving negligence circumstantially;
but such proof may satisfy where the chain of
circumstances leads to a conclusion which is more
probable than any other hypothesis reflected by
the evidence. However, if such evidence lends
equal support to inconsistent conclusions or is

[10] The United States Supreme Court, in addressing summary judg-
ment motions under the parallel FR Civ P 56(c), has also explicitly
recognized that the nonmoving party must offer evidence of a charac-
ter which demonstrates a need for trial:

If the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted. [*Anderson,* n 9
*supra* at 249-250. Citations omitted.]

equally consistent with contradictory hypotheses, negligence is not established.

Our case law effectively illustrates the degree of circumstantial proof required to enable jurors to reasonably infer the existence of a causal relationship between a defendant's actions and a plaintiff's injuries. For example, in *Schedlbauer,* a plaintiff boat owner suffered injuries when his pleasure boat exploded. The plaintiff filed suit against the boat manufacturer, claiming that a defectively porous fuel pump caused gasoline to leak into the boat's bilge area, ultimately resulting in the explosion. The controlling question was whether the plaintiff could offer enough evidence to establish that the gasoline entered the bilge area via the allegedly defective fuel pump, thereby producing the blast.

The plaintiff relied upon circumstantial proof to verify his causation theory. The proofs included: the plaintiff's testimony that, while the boat had operated without incident in the past, immediately before the explosion, the engine started to "run 'rough' ";[11] the plaintiff's expert testimony that if there had been a leak in the fuel pump, the engine would not turn off, but it would " 'run roughly' ";[12] the expert's opinion that the gasoline entered the bilge area through the fuel pump and caused the explosion; the expert's view that if gasoline had entered the bilge area in any other way, the engine would have necessarily shut off automatically during the explosion; and the plaintiff's testimony that during the explosion the motor continued to run until he manually turned it off.

In particular, this Court emphasized that the expert's testimony "fairly indicate[d] 'a logical

[11] *Schedlbauer* at 228.
[12] *Id.* at 226.

sequence of cause and effect' "[13] between the alleged defect and resulting injury. The Court also acknowledged the defendant's alternative causation theories, but found them to be less than probable. On the basis of the plaintiff's circumstantial evidence, the Court concluded that a jury would have sufficient ground to infer that the defendant's defective fuel pump caused the explosion and, in turn, the plaintiff's injuries.

*Kaminski* also highlights the level of circumstantial evidence needed to adequately establish causation. A plaintiff factory worker incurred injuries when he was hit by a trailer that was parked near a railroad track. The plaintiff filed suit against the defendant railroad company, claiming that the conductor's negligent failure to see the trailer caused the train to push the trailer into the plaintiff, injuring him. The collision occurred at night, and there were no eyewitnesses to the accident.

The plaintiff's circumstantial proof showed that moments before the accident the plaintiff had stopped within six feet of the train track, the dark green trailer was parked near the track on the same side that the plaintiff had stopped, and the train was approaching the area where both the plaintiff and trailer were located. Nearer to the time of the collision, the evidence indicated that the train conductor heard a screeching noise coming from the side of the train where both the plaintiff and trailer were situated. At the time of the collision, the plaintiff, also having heard the same screeching noise, was suddenly struck by something he could not see. Immediately after the collision, the plaintiff found himself lying on top of the trailer. The evidence also indicated that, other

---

[13] *Id.* at 224.

than the moving train, there were no other objects
in the area that could have pushed the trailer into
the plaintiff.

The Court found that these circumstantial
proofs could facilitate a jury in inferring a logical
causal relationship between the defendant's negli-
gence and the plaintiff's injuries. The Court men-
tioned the defendant's contrary causation theories,
but in the end dismissed them, explaining that
while they were "possible," they were "not proba-
ble."

In contrast to these cases, the circumstantial
evidence offered in *Jordan* did not afford jurors an
opportunity to deduce a causal link between a
defendant's actions and an injury. In *Jordan,* the
plaintiff's decedent was electrocuted while repair-
ing an overhead crane. The plaintiff brought suit
against the manufacturer of the crane, asserting
that the manufacturer had negligently failed to
ground the crane's electrical system, and that this
negligence caused the decedent's death. There
were no eyewitnesses to the accident.

The plaintiff was unable to offer any evidence
establishing where the decedent was located on
the crane or what he may have been touching
when he was electrocuted. The sole evidence pre-
sented consisted of testimony from the plaintiff's
expert regarding purely hypothetical situations.
The expert was unable to give an opinion regard-
ing whether the lack of grounding had any causal
correlation with the decedent's particular electro-
cution. On the basis of the lack of evidence, the
Court concluded that plaintiff failed to adequately
establish causation.

In *Howe,* the circumstantial causal proof was
equally deficient. A brakeman for a railroad com-
pany was getting off a waycar in the dark when he
fell to his death from the bridge on which the car

had stopped. The brakeman's representative brought suit against the railroad company, claiming that the railroad's negligent failure to provide more space between the track and the edge of the bridge resulted in the decedent's death. The misadventure occurred on a dark and rainy night, and no one observed the actual fall.

The circumstantial evidence established that the train had stopped on the bridge, and, pursuant to his duties, the decedent prepared to get off the train to set up flagman signals. The decedent was last seen buttoning his coat by the rear door of the car with two lanterns at his feet. The decedent's representative argued that it was reasonable to infer that the decedent thereafter alighted from the train, and that the insufficient landing space caused the decedent to fall off the bridge. The Court regarded this causation theory as unlikely without additional facts and circumstances for support, reasoning:

> This is one possible explanation of the manner decedent came to his death. It is by no means the only one. No eye saw him after he left the car. No one even knows from which side of the car he left. Is it not just as possible that he stumbled or slipped from the platform or steps of the car and fell into the river? If he did, the space afforded him for walking between the car and the edge of the bridge had nothing to do with it. One theory is as reasonable as the other. Additional ones might be and have been advanced, but the jury should not be permitted to conjecture that he fell from one cause and not from another. [*Id.* at 583-584.]

V

Unlike the circumstantial proofs submitted in *Schedlbauer* and *Kaminski,* and more like those

offered in *Jordan* and *Howe,* the plaintiffs' circumstantial evidence here did not afford a reliable basis from which reasonable minds could infer that more probably than not, but for the defect in the Square D switch, Mr. Skinner would not have been electrocuted.

Plaintiffs' causation theory is that the faulty switch caused the decedent to be confused about whether the machine was on or off; that this confusion induced him to touch the live wires; and that this contact resulted in his electrocution. To support this theory, the plaintiffs offered testimony from co-workers who stated that, in the past, the decedent was always a careful worker, and always turned the power off before he manually reversed the alligator clips. On the basis of this testimony, the plaintiffs urge that the switch must have confused the decedent regarding whether the machine was on or off on the day that he touched the wires and that this confusion led to his electrocution. The lower courts explicitly exposed the critical problem with this theory.

If the machine had been operating, the decedent could not have been confused by the switch in the way that the plaintiffs contend. The plaintiffs do not dispute that when the tumbler is running, it makes a considerable amount of noise, and that the drum moves in a circular motion. The decedent could not have been confused regarding the power's status because either the noise or the visual appearance of movement would have affirmatively cued him regarding whether the power was on or off—regardless of what the switch may have indicated.

In view of this factually established phenomenon, the plaintiffs had to offer an alternative sequence of cause and effect, whereby the decedent was confused by the switch, but the machine was

not in operation. The plaintiffs proposed an hypothesis under which Mr. Skinner thought that the machine was off because of a faulty indication from the switch, the power was actually on, but the machine was not running *because the wires were not attached to the alligator clips.* Under this hypothetical situation, the following antecedent events would necessarily had to have transpired: the machine had to have been turned off, the wires then unhooked, and, the machine thereafter turned back on. This scenario is fatally flawed in two respects.

First, the plaintiffs failed to produce any evidence from which a jury could reasonably conclude that the wires were unhooked when Mr. Skinner began using the machine just before the accident. In fact, the only record evidence pertaining to how the wires and clips were maintained indicated that they would probably have been connected.[14] Second, the plaintiffs did not offer any proof from which it rationally could be inferred how the machine would have been turned back on after the wires had been unhooked.[15]

Of course, the plaintiffs' offered scenario is a *possibility.* However, so are countless others. As explained above, causation theories that are mere possibilities or, at most, equally as probable as

---

[14] In his deposition, Carl Jacobs, a co-worker of the decedent, described the normal status of the wires:

> *Q.* So, when you would come in in the morning, to start your shift, how would you go about starting up everything?
> *A.* Well, usually what I have to do is go to the off and on box and I have to turn it on, and I have to—when I turned it on, *the wires are automatically hooked up,* and I would see which way the barrel is running . . . . [Emphasis added.]

[15] Plaintiffs claim that the switch was defective because it gave the appearance that the power was off when it was really on. They have never suggested that the switch was flawed because it sometimes made the power automatically go back on after it had been turned off.

other theories do not justify denying defendant's motion for summary judgment.[16]

Plaintiffs further argue that the testimony of their experts proved factual causation. In *Jordan,* this Court taught that expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury.[17] Moreover, in *Mulholland* at 411, we stated that "there must be facts in evidence to support the opinion testimony of an expert."[18]

Plaintiffs' expert testimony did not sufficiently establish causation. Plaintiffs' experts maintained that the switch was defective, and that the defect was the proximate cause of the decedent's death.

[16] We believe the Court of Appeals dissent was incorrect with regard to two presumptions—one in fact, the other in law. First, it assumed that there was evidence that the wires were unhooked, and, second, it assumed that a *possible* theory of causation was sufficient to withstand a motion for summary judgment:

> [I]t was clearly established by experts for both parties that the power could be on with the switch in an ambiguous position, the tumbler not turning, and the motor not running, *because the reversible wires were disconnected.* . . . It does not take a journeyman electrician, let alone a distinguished professor, to make sense of that *possible occurrence.* [195 Mich App 672-673. Emphasis added.]

[17] In *Jordan,* because the experts' testimony did not corroborate with any established facts, we ruled that a directed verdict was appropriate:

> The sole evidence presented consists of expert testimony that a hypothetical person making simultaneous contact with a live conductor and metal would have a "70 or 80 per cent chance of extracting himself from that connection" if the crane were grounded. The mere possibility that a defendant's negligence may have been the cause, either theoretical or conjectural, of an accident is not sufficient to establish a causal link between the two. [*Jordan* at 150-151. Citation omitted.]

[18] The expert in *Mulholland* had sufficient evidentiary support for his opinion, which, in particular, was premised on the expert's first-hand perceptions of the incidents in question.

The experts' causation theories were deficient, however, because each lacked a basis in established fact. Specifically, each expert either assumed, or was asked to assume, that (somehow) the wires were unhooked, and that the power was on when Mr. Skinner began working on the machine. Because the experts' conclusions regarding causation are premised on mere suppositions, they did not establish an authentic issue of causation.

Taking the record evidence in the light most favorable to the plaintiff, we conclude that the record facts do not manifest a genuine issue of factual causation. The offered evidence only established that an accident took place. Michigan law does not permit us to infer causation simply because a tragedy occurred in the vicinity of a defective product. The plaintiffs were required to set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect. Instead, the plaintiffs posited a causation theory premised on mere conjecture and possibilities.[19]

We recognize that motions for summary judgment implicate considerations of the jury's role to decide questions of material fact. At the same time, however, litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess.

We are also aware that courts should exercise restraint when deciding to dismiss a suit for lack of evidence. *Holloway* at 622.[20] Nonetheless, in this

---

[19] Moreover, plaintiffs' attempts to refute the defendant's offered theories of causation have no effect. Under MCR 2.116(G)(4), the plaintiffs must come forward with a set of evidentiary facts establishing their *own* genuine theory of causation.

[20] "It is true that where an injury occurs that cannot be accounted for and where the occasion of it rests wholly in

case we are confident that the plaintiffs were unable to establish an essential element of proof. The decedent's tragic death remains a matter of speculation.[21]

Because the plaintiff did not show a genuine issue of material fact for trial as required under MCR 2.116(G)(4), we find that the lower courts did not err in granting the defendant's motion for summary judgment.

## VI

For the reasons stated by the Court of Appeals, we also find that the trial court did not err in granting the defendant's motion for summary judgment on the plaintiffs' claims of failure to warn and failure to insulate.

Accordingly, we affirm the judgment of the Court of Appeals.

BRICKLEY, BOYLE, RILEY, and MALLETT, JJ., concurred with CAVANAGH, C.J.

LEVIN, J. (*dissenting*). The estate of Chester W.

conjecture, the case may fail for want of proof. . . . But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than upon the other." [*Id.*, quoting *Schoepper v Hancock Chemical Co*, 113 Mich 582, 586; 71 NW 1081 (1897).]

[21] Language from our decision in *Howe* seems particularly fitting in this regard:

"I cannot see in any of this evidence anything which would enable a jury to do more than speculate; that would enable a jury to fall back upon any proof as to what caused the accident. . . . It impresses me as being one of the unfortunate, but inexplicable happenings, which is not susceptible of proof, and in the absence of proof it seems to me that the plaintiff's action must fail." [*Howe* at 585. Citations omitted.]

Skinner commenced this action claiming that his death was the result of a defect in design of an on/off switch manufactured by Square D Company, or a failure properly to insulate the switch, or a result of both such defect and failure.

The question presented is whether the estate produced sufficient evidence to resist Square D's motion for summary disposition that contended the estate's theory of causation was not reasonably inferable from the evidence. Square D in effect conceded, for the purposes of the motion, that the switch was defectively designed and not properly insulated.[1]

The circuit judge granted the motion, and the Court of Appeals affirmed, one judge dissenting.

I would hold that the estate produced sufficient evidence to require jury submission of the question whether Skinner's death was caused by the defect in design and failure to insulate so in effect conceded.

I

Skinner was in the business of cleaning and finishing metal parts. He was electrocuted while working with a homemade tumbling machine activated by turning, from off to on, the Square D switch that he had installed between the machine and the outside source of power.

Skinner would place the parts to be cleaned in the tumbler's metal drum and then turn on the power to spin the drum. After the parts had been spun for a period of time, Skinner would reverse the direction of the drum.

Skinner reversed the direction of the drum by unhooking, by hand, two of three alligator clips

---

[1] This concession was explicit with respect to the defective design and implicit with respect to the failure to insulate.

that connected electrical wires from the tumbling machine to the Square D on/off switch. Skinner would then reattach the clips to different ports on the tumbling machine, and turn the Square D switch from off to on to start the drum going in the reverse direction.

It was, as the Court of Appeals observed, imperative that the operator of the tumbling machine assure that the power was off before he touched the alligator clips. 195 Mich App 664; 491 NW2d 648 (1992).

On February 21, 1986, Skinner was working in the area of the tumbling machine. His wife, Doris L. Skinner, who commenced this action as personal representative of his estate, and her two sisters, all employees at Skinner's shop, were working in an adjacent room when they heard Skinner cry for help. The women ran to the tumbling room to find Skinner in excruciating pain, with electricity flowing through his body, standing with his hands above his head and an alligator clip in each hand. As the women began to move toward Skinner, he warned them to stand back and not to touch him.

Skinner struggled to release his hands from the clips. He was able to free his left hand, and, with the left hand, pulled down the handle on the Square D on/off switch to move it to, or further to,[2] the off position. Skinner then spun around, fell to the floor, and died.

II

The estate's theory of causation is that the

---

[2] The estate's expert witnesses testified that there was a phantom zone in which, although the switch appeared to be in an off position, it was not entirely off, and, thus, the switch could falsely indicate that the power was off. Again, for purposes of its motion for summary disposition, Square D conceded that the on/off switch was so defective.

defective on/off switch caused Chester Skinner's death in the following manner. Skinner entered, or had been working in, the room containing the tumbling machine. The tumbling machine was not being operated immediately before Skinner touched or picked up the electrical wires. Before touching the wires, in accordance with his habit, he looked at the on/off switch.

The concededly[3] defective on/off switch falsely indicated that it was in the off position,[4] and thus that there was no electricity flowing through the wires. Relying on his reading of the on/off switch, Skinner touched the wires and suffered the excruciating electrical shock.

### III

We agree with the majority[5] that Square D's motion for summary disposition, asserting that the estate's theory of causation is not reasonably inferable from the evidence, poses the question whether, as stated by the United States Supreme Court, "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v Liberty Lobby, Inc,* 477 US 242, 250; 106 S Ct 2505; 91 L Ed 2d 202 (1986). The Court continued that the "standard mirrors the standard for a directed verdict" that a "trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict;" "[i]f reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.,* pp 250-251.

---

[3] See n 1 and accompanying text.
[4] See n 2.
[5] *Ante,* p 166, n 10.

The United States Supreme Court also observed that "the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard: 'The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.'" *Id.,* p 251.

This Court in *Mulholland v DEC Int'l Corp,* 432 Mich 395, 415; 443 NW2d 340 (1989), said that on a motion for directed verdict in a product liability case "'the question is whether it is reasonable to infer from the evidence, direct or circumstantial, that the accident was probably caused by a defect attributable to the manufacturer. Questions of comparative probability are to be resolved by the trier of fact.'" Quoting *Holloway v General Motors Corp (On Rehearing),* 403 Mich 614, 622; 271 NW2d 777 (1978). The Court, in *Mulholland,* continued:

> A plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause. It is enough that the plaintiff establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support. *Id.,* p 623. In reviewing the trial court's ruling on a defendant's motion for a directed verdict, we examine the testimony and all legitimate inferences that may be drawn in the light most favorable to the plaintiffs.[6] [*Id.,* pp 415-416.]

---

[6] The majority, *ante,* p 165, quotes approvingly the following from *Mulholland:*

"'The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the

Although this Court has cautioned that "where all theories of causation rest only on conjecture, no jury question [is] presented," *Cummings v Grand Trunk W R Co,* 372 Mich 695, 697; 127 NW2d 842 (1964), it has also emphasized that " *'such cases are rare,* and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than the other.' " *Id.,* pp 697-698, quoting *Schoepper v Hancock Chemical Co,* 113 Mich 582, 586; 71 NW 1081 (1897) (emphasis added).[7]

*Kaminski v Grand Trunk W R Co,* 347 Mich 417; 79 NW2d 899 (1956), demonstrates how a court should decide whether "reasonable inferences" are "better supported upon one side than the other." The Court in *Kaminski,* in holding that reasonable inferences favorable to the plaintiff could be drawn

---

result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.' " [*Id.,* p 416, n 18, quoting Prosser & Keeton, Torts (5th ed), § 41, p 269.]

[7] In *Kaminski v Grand Trunk W R Co,* 347 Mich 417, 421; 79 NW2d 899 (1956), the Court said that a directed verdict on the issue of causation is appropriate only in unusual circumstances:

It is thus right to say that the trial judge's immediate duty, motion for direction having been made with address to the rule of conjectural choice between equally plausible inferences, is to determine on favorable view of the inference plaintiff relies upon whether it stands equiponderant at best with such as is, or are, urged by the defendant. *If the answer is affirmative, then and only then will the judge be justified in proceeding as moved.* [Emphasis added.]

See also *Emery v Chesapeake & O R Co,* 372 Mich 663; 127 NW2d 826 (1964), quoting the statement in *Schoepper v Hancock Chemical Co, supra,* p 586, that cases in which the choice between theories of causation is mere conjecture are rare.

from the evidence, contrasted the defendant's theories of the accident with those advanced by the plaintiff. After scrutinizing the defendant's theories, the Court concluded that "the trouble with the defendant's 'other explanations' is the comparative improbability thereof." *Id.,* p 427.

The majority quotes approvingly from *Kaminski,* but ignores the rule of *Kaminski* requiring scrutiny not only of the plaintiff's theory, but also scrutiny of the defendant's theory, and an assessment of the comparative probability or improbability of the competing theories. The majority in the instant case rejects plaintiff's theory, in the abstract, without engaging in such comparative probability or improbability analysis.

This is not a "rare case" in which all theories of causation are "mere conjecture." A comparison of the contrasting theories indicates that "reasonable inferences" are "better supported upon one side [plaintiff's] than the other."

IV

The plaintiff's theory that Skinner touched the electrical wires after relying on the on/off switch that erroneously indicated the power was off both is the product of reasoned inferences from the evidence and is more probable than any other reasonable theory of causation.

The majority asserts that there are two "fatal flaws" in the plaintiff's theory. First, "the plaintiffs failed to produce any evidence from which a jury could reasonably conclude that the wires were unhooked when Mr. Skinner began using the machine just before the accident."[8]

---

[8] *Ante,* p 172.

Although the majority speaks of the absence of evidence that the wires were unhooked before Skinner began "using the *machine* just

The majority ignores that there is substantial evidence that the tumbling machine was *not* operating when Skinner touched the wires.[9] If the wires had been connected to the tumbler and had power been running through them, the tumbler would have been operating. Since there is substantial evidence that it was not operating, a trier of fact could reasonably conclude, without resorting to conjecture, that the electrified wires were not

before the accident" (emphasis added), surely the majority means that the plaintiff failed to produce evidence from which a jury could reasonably conclude that the wires were unhooked when Skinner *"touched"* them just before the accident.

There is no evidence that the machine itself was being operated just before the accident, and substantial evidence to the contrary. See n 9.

[9] Although none of the deponents stated unequivocally that the tumbler was not operating at the time of the accident, a fair reading of the deposition testimony yields this conclusion. First, Doris Skinner testified that she did not believe that Chester Skinner had run the tumbler at all on the day of his death. She testified as follows:

> *Q.* Do you know if he had been working on that machine [the tumbling machine] all day?
> *A.* No, I don't think he run it. Mostly, I think, he was welding because he had another machine he was working on. The man come [sic] and picked it up. It wasn't completed.

Doris Skinner would almost surely have known if the machine had been running at the time of the accident. She testified as follows concerning the noise that the machine made when it was cleaning parts:

> *Q.* When the tumbler was running, the one that your husband was injured on, was it a noisy machine?
> *A.* When you put a ton of parts in a machine, it is noisy.
> *Q.* Could you tell the difference in noise level when the machine stopped, when the motor stopped?
> *A.* Well, if it is not running, you would know, yes.

Carl Jacobs, the only person besides Skinner to operate the tumbler machine, also testified that the machine made quite a bit of noise when it was operating.

There is no testimony that any of the women who were working in the room adjacent to the tumbler room heard the noise of the tumbler during the period immediately preceding the accident.

connected to the tumbler when Skinner touched them.[10]

Alternatively, if the wires were hooked up to the tumbling machine when Skinner touched them, the trier of fact could reasonably conclude—because of the evidence that the tumbler was not operating—that power was not flowing through the wires when Skinner touched them and removed them from the machine. If that was the case, then the situation would have been exactly the same as if the wires had been unhooked from the machine sometime before Skinner touched them just before the accident.

This brings us to the second "fatal flaw" highlighted by the majority when it states that the plaintiff failed to "offer any proof from which it rationally could be inferred how the machine would have been turned back on after the wires had been unhooked."[11]

There are not an infinite number of ways in which the power could have been restored to the wires. Skinner could have purposely restored power to the wires and then forgotten that he had done so before touching them. Another person could have restored power to the wires before

---

[10] It is true that "the only record evidence pertaining to how the wires and clips were maintained indicated that they would probably have been connected." *Ante,* p 172. The evidence referred to in the majority opinion is the testimony of Carl Jacobs to the effect that the wires were usually connected to the tumbler.

The record indicates, however, that the accident occurred at one of those unusual moments when the wires were unhooked. There was substantial evidence that the tumbler was not operating at the time of or immediately before the accident. The electrical wires must have been unhooked because they were electrified, and the tumbler was not running.

[11] *Ante,* p 172.

Again, the majority misspeaks. The question is not whether it can be inferred "how the *machine* would have been turned back on after the wires had been unhooked" (emphasis added), but rather how the *power* would have been turned back on after the wires had been unhooked.

Skinner touched them. Skinner could have accidentally restored power to the wires as he was holding the wires (by falling on the switch), or some object could have fallen on the handle thereby turning the power on as Skinner was holding the wires.[12]

Taking the last possibility first, there is no evidence that any object with a mass great enough to move the on/off switch fell on the switch as Skinner was holding the wires. No witness reported finding such an object in the vicinity of the tumbler, and there does not appear to be a shelf above the on/off switch from which such an object could have fallen.

The evidence seems to clearly establish that Skinner did not fall on the switch. When the three women found Skinner, he was standing on a wooden pallet with his arms above his head.[13] Surely, he could not have fallen on the switch and regained his balance while suffering a tremendous electrical shock—one that no doubt crippled his muscles.[14]

---

[12] As the majority observes, there is no claim that the power could accidentally turn on without some force being applied to the on/off switch.

[13] Beulah McBride testified during deposition concerning her discovery of Skinner:

> *Q.* And what exactly did you see when you saw him?
> *A.* He was standing with his hands up in the air like this.
> *Mr. Nolan* [plaintiffs' counsel]: You had both hands up over your head, so the record reflects. Go ahead.
> *Ms. Neilson* [defense counsel]: Yeah. You can go ahead.

[14] During the course of discovery, the defendant advanced theories of how the accident could have occurred. The defendant first hypothesized that Skinner was electrocuted when he attempted to unhook the wires from the tumbler while the power was on. It appears that this could not have happened simply because had the electrified wires been attached to the tumbler before Skinner touched them, the tumbler would have been operating. The unequivocal testimony of the three women who found Skinner, however, establishes that the tum-

A theory that posits that something or someone restored power to the wires by falling on the switch can be discarded because the power was "on" when the switch was in the "up," not the "down," position.[15] Any downward pressure on the switch would have turned the power off, not on.

That leaves only the possibilities that either Skinner[16] or some other person restored power to the wires. Under both of these remaining explanations of how power was restored to the wires— either by Skinner accidentally before he touched or picked up the wires or by another person— Skinner would have had an opportunity to rely on the faulty on/off switch before touching the wires.

The dispositive question then becomes whether the plaintiff presented sufficient evidence to create a question of fact whether Skinner relied on the on/off switch before touching the wires. I conclude that the plaintiff produced sufficient evidence. The evidence consisted of the uncontradicted testimony of Violet Whiting that Skinner always looked at the on/off switch before he would touch the

bler was not operating at the time of the accident or immediately before the accident. Violet Whiting also testified that Skinner always made sure that the power was off before he changed the wires on the machine. See n 17.

The defendants also suggested that Skinner may have grabbed the live wires as he fell to the ground. This theory, too, is refuted by the testimony of the women who found Skinner. They testified that Skinner was standing up with his hands above his head. It would not have been possible for Skinner to have grabbed the clips, received a tremendous shock, fallen, and then regained his balance and put his hands above his head.

[15] The trier of fact could properly conclude that the power was "on" when the switch was in the "up" position because Violet Whiting and Beulah McBride both testified that Skinner pulled the switch *down* to shut off the power when he was being electrocuted.

[16] To be sure, if Skinner had turned on the power and then had forgotten that he had done so, that would have been a lot of comparative negligence. But the issue on which summary disposition was granted was the absence of the requisite causal relationship.

wires.[17] A trier of fact could reasonably conclude
from the habit evidence that Skinner looked at the
on/off switch before he touched the wires and,
thus, that he only touched the wires after satisfy-
ing himself that they were not energized.[18]

V

I also conclude that the Court of Appeals erred
in affirming the circuit court's grant of summary

[17] Violet Whiting testified during deposition:

> *Q.* Every time you saw him reverse the machine, did he
> always throw the switch to the off position and stop the
> machine before he took the wires?
> *A.* Yes he did.
> *Q.* Would he look at the switch to observe the switch to see if
> it was in an off position before he would touch the wires?
> *A.* I think he always did.
> *Q.* When you saw him, he always did?
> *A.* Yes. *He always made sure it was off.* [Emphasis added.]

[18] MRE 406 provides that evidence of habit is admissible to estab-
lish that, on a given occasion, an individual acted in conformity with
a previous pattern of behavior.

This Court has said that "[t]here is general agreement that habit
evidence is highly persuasive as proof of conduct on a particular
occasion." *McKinstry v Valley Obstetrics-Gynecology Clinic, PC,* 428
Mich 167, 182, n 6; 405 NW2d 88 (1987).

The Court of Appeals has held that habit evidence is admissible to
prove that a decedent acted in conformity with his previous behavior
pattern. *Hoffman v Rengo Oil Co, Inc,* 20 Mich App 575; 174 NW2d
155 (1969); *Kovacs v C & O R Co,* 134 Mich App 514, 538; 351 NW2d
581 (1984).

Other courts have reached similar conclusions. See *Frase v Henry,*
444 F2d 1228, 1232 (CA 10, 1971) (under Kansas law, evidence
regarding specific driving practices of a decedent was admissible as
tending to show that the deceased acted in conformity with past
practice at the time of a fatal accident); *Gardner v Geraghty,* 98 Ill
App 3d 10, 15-16; 423 NE2d 1321 (1981) (evidence of a decedent's
habit of carefully crossing streets was admissible as tending to show
that the decedent was carefully crossing street at the time of the
accident, at least where there is no eyewitness to the accident); *State
v Libby,* 546 A2d 444, 449 (Me, 1988) (evidence of a decedent's bathing
habits in a criminal trial arising out of drowning in a bathtub was
admissible as tending to show that the decedent would have avoided
total immersion bathing).

disposition against the plaintiff on the failure to insulate claim.

The plaintiff's failure to insulate claim asserted that Skinner did not die from the initial shock, but instead died when he touched the uninsulated handle of the Square D on/off switch. The plaintiff claims that when Skinner touched the uninsulated handle of the on/off switch, the magnitude of the shock he was receiving increased, thereby killing him.

The Court of Appeals found this claim to be "disingenuous." *Id.,* p 670. The Court said that the plaintiff presented no evidence that could have established that it was only at the instant that Skinner touched the on/off switch that the shock became fatal. The Court stressed that even the plaintiff's expert witness conceded that Skinner could have been electrocuted even if the on/off switch had been insulated and that Skinner could have been electrocuted before he reached for the on/off switch. The Court also emphasized that a pathologist "testified that Mr. Skinner had already completed the circuit by the time he grabbed for the switch, with the current entering his right hand and exiting through the balls of his feet." *Id.*

The Court of Appeals erred in failing to advert to and consider the testimony of two expert witnesses for the plaintiff who testified that the magnitude of the shock that Skinner was receiving could have been increased when he grabbed the uninsulated handle of the Square D switch.[19]

---

[19] Mr. James Dutton, an engineer for Square D, testified during deposition:

> *Q.* [I]sn't it true that you could be receiving a less substantial shock from the wires, and then touch this metal on the switch and increase the substance of the electrical shock by which you're being given?
> *A.* You could touch that handle, or any grounded surface, and the possibility of increasing it is there.

The Court of Appeals also erred in failing to advert to and consider the nonexpert testimony of the women who found Skinner suffering from shock. Doris Skinner and Violet Whiting testified that when they ran into the room where the tumbling machine was located, they found Skinner conscious and in severe pain from the shock. As the women began to approach Skinner, he apparently recognized that the women would be in danger if they touched him as he was receiving the shock, and he warned them not to touch him.[20] The women further testified that it was not until Skinner freed his left hand and grabbed the uninsulated handle that he lost consciousness and dropped to the ground.[21]

---

After testifying that the uninsulated handle was a secondary, not primary, cause of the electricity running through Skinner's body, the pathologist was asked if the secondary cause would increase the magnitude of the shock that Skinner was receiving. He answered, "[s]ure."

[20] Beulah McBride testified during deposition that Skinner said, "don't touch me," when the women entered the room. Violet Whiting similarly testified that when the women entered the room Skinner said, "don't touch me."

[21] Beulah McBride explained how Skinner struggled to free one hand, grabbed the uninsulated switch, and then slumped to the floor:

> *Q.* And then what happened?
> *A.* Well, he got one hand loose, his left hand. He reached over, and pushed on the switch, and he made a half turn and fell to the floor.

Violet Whiting similarly testified that Skinner was struggling to free himself from the clips and did not fall or lose consciousness until he touched the handle:

> *Q.* Now, you indicated that you saw him reach for the switch; is that correct?
> *A.* Yes, I did.
> *Q.* Could you see that yourself?
> *A.* The switch?
> *Q.* Yes.
> *A.* Yes, I could.
> *Q.* Could you see the front of Mr. Skinner from where you were standing?

Although the testimony of the women conflicts with that of the defense expert witnesses who testified that Skinner was, in effect, "dead" before he touched the uninsulated handle, their testimony is nonetheless evidence that Skinner did not die from the initial shock. Skinner was able to think rationally and communicate while he was receiving the initial shock.

The law requires that all reasonable inferences must be drawn in favor of the nonmoving party. The testimony of the women who found Skinner and of the expert witnesses who opined that the uninsulated handle could have increased the magnitude of the shock that Skinner was receiving is sufficient to create a question for the trier of fact concerning whether the uninsulated handle contributed to Skinner's death.

GRIFFIN, J., took no part in the decision of this case.

---

*A.* Well, he had his back to us, until he got loose, and then he turned around and he came down.