# STATE OF MICHIGAN

# COURT OF APPEALS

MICHELE HOLT and FLOYD HOLT,

      Plaintiffs-Appellees,

v

LEGACY HHH, VHS HARPER-HUTZEL
HOSPITAL, INC., and HOLLISTER-WHITNEY
ELEVATOR CORPORATION,

      Defendants,

and

OTIS ELEVATOR COMPANY,

      Defendant-Appellant.

UNPUBLISHED
May 26, 2016

No. 325345
Wayne Circuit Court
LC No. 13-002501-NO

Before: BOONSTRA, P.J., and METER and BECKERING, JJ.

PER CURIAM.

Defendant, Otis Elevator Company (Otis), appeals by leave granted an order denying its motion for summary disposition of the claims of plaintiff Michele Holt (Michele) and her husband, plaintiff Floyd Holt, related to injuries Michele allegedly suffered when a rope gripper stopped an elevator she was riding while at work at Harper Hospital in Detroit.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

### A. AUGUST 6, 2010 INCIDENT

On August 6, 2010, at approximately 9:00 a.m., Michele, who was in charge of patient transport at Harper Hospital, entered elevator number 10 on the eighth floor of the hospital. Janet Hester was already in the elevator. As the elevator began its descent to the basement, it

---

[1] According to plaintiffs' complaint, defendants Legacy HHH and VHS Harper-Hutzel Hospital, Inc., are assumed names for Harper Hospital.

-1-

"seemed to go very quickly, and then all of a sudden it stopped." Michele recalled that "it felt like [the elevator] bounced. The sudden stop threw Michele and she hit her left knee on a panel on the side of the elevator. She was also thrown backwards, which caused her to hit her upper back and the back of her head on the rear elevator wall. After a brief pause, the elevator descended again before stopping abruptly for a second time. Michele was thrown again, and she collided with the front and rear walls of the elevator. She hit her knee, which made what she described as a popping sound.

Several Otis employees were at Harper Hospital on the day of the incident working to "modernize" the elevators. They were not working on elevator 10 or the bank in which the elevator was housed that day; work on elevator 10 had recently been completed and city officials had tested and certified the elevator two days before the incident. Ralph Kates, part of the four-person modernization crew, was working on top of elevator 12 at the time of the incident and noticed that elevator 10 stopped abruptly. After calling down to the passengers to see if they were injured, Kates contacted his supervisor, Mark McMillen, and told him about the situation.

McMillen decided to investigate the problem by venturing into what many witnesses described as the "machine room" or "elevator machine room." The machine room is located on the 11th floor of Harper Hospital; the 11th floor is only accessible by a freight elevator that requires special access or by a stairwell secured by a locked door. The machine room is further secured by locked, self-closing doors.[2] McMillen testified that his modernization crew did not have keys to the machine room and that they could only enter if they were allowed in by hospital personnel or by Roy England, an Otis maintenance mechanic who worked at the hospital. Further, only a few, select hospital employees had keys to the machine room.[3] McMillen was able to access the machine room door on the morning of the incident because the main door to the room had been propped open.

McMillen testified that he had been in the area of the machine room the morning of the incident and he recalled seeing an unknown individual enter the room through the main door, which had been propped open in violation of city code requirements.[4] McMillen first testified that the individual was not wearing a green Otis uniform, but later testified that he had no recollection of the color of the uniform that the individual wore. The only thing McMillen could recall about the individual was that he was male.

---

[2] Detroit City Code required the doors to the machine room to be locked and to self-close.

[3] In 2008, Otis and Harper Hospital entered into a maintenance agreement which provided that the elevator units remained the possession of, and were under control of, Harper Hospital. The agreement also provided that Harper Hospital agreed to "provide [Otis] unrestricted ready and safe access to all areas of the building in which any part of the Units are located . . . ."

[4] Roy England, a maintenance mechanic employed by Otis and who was not part of the modernization crew, testified that he would prop the door open for the modernization crew.

When McMillen entered the machine room following Kates's report of the incident with elevator 10, the unknown individual was still in the machine room, and the door was still propped open. McMillen walked over to the machinery for elevator 10, which was on the opposite side of the room from the unknown individual, and began examining the elevator by using a diagnostic tool. Kates told McMillen, and McMillen's investigation confirmed as much, that a device called a "rope gripper" had set on elevator 10, causing it to stop suddenly. McMillen's diagnostic tool reported that the overspeed governor switch (overspeed switch) had been tripped, causing the rope gripper to deploy.[5] The overspeed switch at issue was located on the floor between elevators 10 and 11. The switch was designed to deploy in the event the elevator began descending over a certain, unsafe speed. According to McMillen, elevator 10 had not "oversped," meaning it had not reached the type of speed that would have tripped the overspeed switch.

## B. THE OVERSPEED SWITCH

At the time of the incident, the overspeed switch for elevator 10 was located on the floor and was not protected or covered in any fashion. Several witnesses testified that someone could easily brush up against the switch and accidentally trip it. For instance, Dennis Christiaens, plaintiff's expert witness, testified in his deposition that the overspeed switch was a "very delicate switch" and that it "doesn't take much to trip that switch."

Deposition testimony in this case produced considerable material concerning how the overspeed switch was tripped. As noted, McMillen's diagnostic tool ruled out the idea that elevator 10 had in fact, "oversped," meaning that the elevator had not traveled fast enough to trip the switch and deploy the rope gripper. There was also testimony from several witnesses that, although a power failure could possibly cause the deployment of the overspeed switch, a power failure had not occurred in this case. Christiaens testified that under the known circumstances in this case, i.e., that the elevator had not "oversped" and there was no power failure, the overspeed switch must have been tripped manually, meaning that someone had intentionally or accidentally tripped the switch and caused elevator 10 to stop abruptly. According to Christiaens, such a manual tripping of the switch could only occur if someone touched the overspeed switch.

As to what could have caused the switch to trip given that a power failure or overspeed condition could be ruled out, McMillen testified that "everything would be speculation." He testified that there were "too many" potential causes to list, then testified that "[t]he only way that switch can get tripped without the elevator tripping it is either by vibration or somebody hit it." He then testified, without offering any additional examples, that vibration or someone hitting the switch were "not the only things that could cause" the switch to trip.

---

[5] Several witnesses testified that when the overspeed switch is tripped and the roper gripper device engages, the elevator stops, and it cannot begin moving again until the overspeed switch and rope gripper are reset.

Kates testified that he discussed the incident with McMillen on the day it occurred and McMillen did not say anything with regard to the switch being tripped by an individual. However, at "some later point," they discussed the incident again and McMillen told him that he thought someone had walked by the overspeed switch and tripped it by mistake. Kates testified that it took little force to trip the switch and agreed that someone walking past the switch could hit it by mistake and accidentally trip the switch.

Joseph Steger, an Otis employee, testified that it would be "speculation" to attempt to determine what tripped the overspeed switch in this case. He testified, though, that he did not know of any possible causes to explain why the switch was tripped, aside from someone manually tripping the switch. He later testified that the switch could "vibrate and swivel," but acknowledged that the switch was designed so as to avoid being tripped through vibration.

Doug Dietrich, an employee of Hollister-Whitney Elevator Corporation, the entity that manufactured the rope gripper and overspeed switch at issue in this case, testified that the overspeed switch is designed to stay closed under normal conditions and that "spring washers" were put in place to create resistance. To his knowledge, Hollister-Whitney had not received any complaints or reports about an overspeed switch deploying under normal operating conditions, due to "vibration or whatever." In his opinion, in the absence of an overspeed condition, the only thing that would cause the overspeed switch to deploy would be physical contact with the switch.

Ronald Creak, an expert witness retained by Harper Hospital, opined that there were three potential causes for the incident. The first of which was that the overspeed switch was defective. The second potential cause was that the governor switch had not been reset after city inspectors tested elevator 10 two days prior to the incident. The third potential cause Creak identified was potential physical contact with the switch.

Dennis Olson, an expert retained by Hollister-Whitney, testified that subsequent testing of the governor switch at issue and of elevator 10 demonstrated, in his opinion, that there was no design defect in the switch. Olson disagreed with Creak's opinion that the incident involving the sudden stoppage of elevator 10 could have been caused by an improperly reset governor switch following testing by city inspectors. Olson testified that the switch could not be partially reset; it would either be fully closed or fully open. Olson opined that the sudden stoppage that allegedly caused Michele's injuries was caused by the elevator

> clip[ing] a door lock which activated the rope gripper which brought the car to an emergency stop and . . . as a result of the emergency stop of the car, that the governor tension weight bounced, which caused the rope to snap back down on top and impact the governing causing the switch to trip.

In other words, Olson thought that the governor switch tripped *after* the rope gripper was activated, contrary to the testimony of several others who opined that the switch was tripped first, and then the rope gripper was activated.

Clarence Fox, an expert retained by Otis, testified that vibration and normal building movement could have caused the governor switch to trip, but admitted he did not have any

evidence to support the possibility that vibration caused the switch to trip. Fox could not identify any other instances in his 57-year career where an overspeed switch was tripped by vibration and admitted McMillen's theory about the switch possibly being tripped by building vibration was "speculation."

Roy England, an Otis employee who worked at Harper Hospital as an elevator maintenance mechanic and who was not part of the four-person modernization crew, testified that he was working in the machine room at the time of the incident. He testified that he was kneeling next to elevator 9 and two other members of the "Otis crew" were across from him. He did not know the names of the individuals. England testified that no one was standing by the overspeed switch for elevator 10. He did not recall seeing anyone near elevator 10 before the incident, and testified that if someone had tripped the overspeed switch, he would have noticed, given his proximity to the elevator.

## C. OCCUPANCY OF THE MACHINE ROOM

In addition to conflicting deposition testimony about what caused the overspeed switch to trip, there was also conflicting deposition testimony about who was in the machine room at the time the switch was tripped. As noted above, England testified that he was in the machine room at the time of the incident, as were two other Otis employees, the names of whom he could not recall. England testified that the elevator was operational[6] after the sudden stop and that he received a telephone call from Mike Murdock, the interim director of facilities, engineering, and construction at Harper Hospital, "[q]uickly, within five minutes," after the incident, to go to Murdock's office and to discuss the incident with him.

Donald Art, an Otis employee who was part of the modernization crew on the date of the incident, testified that, "to the best of [his] knowledge and notes," he was working with England on a different bank of elevators at the hospital, not in the machine room, on the date and time of the incident. He testified that he was performing maintenance work with England "on the other side of the hospital" from where the incident occurred.[7]

McMillen testified that when he arrived in the machine room to investigate a "couple minutes" after the incident, an unknown individual was in the room. McMillen testified that

---

[6] When specifically asked about this aspect of England's testimony, Olson testified that the elevator could not have been operational after the rope gripper engaged and overspeed switch had been tripped. The devices would need to be reset in order for the elevator to be operational again. McMillen offered similar testimony about having to reset the devices in order for the elevator to begin moving again.

[7] Plaintiffs' counsel indicated at the oral argument on appeal that England has since recanted his testimony about being present in the machine room at the time of the incident. As noted by plaintiffs' counsel, our analysis is not affected in any way because the testimony of other witnesses contradicted England's contention, and thus, the matter remained a question of fact for the jury.

England arrived in the machine room approximately ten minutes after McMillen got there. And, at that time, McMillen had not yet gotten elevator 10 running again. McMillen testified that he told England he was going to send the elevator to the basement after he reset the governor switch and got the elevator running, and he instructed England to meet the passengers of the elevator—Michele and Hester—in the basement. According to McMillen, England went to the basement to meet Michele and Hester, but discovered that they were already gone when he got there, and England returned to the machine room to report the same to McMillen.

Kates's testimony also disputes whether England was in the machine room, as he testified that England did not arrive in the machine room until after both Kates and McMillen arrived. Specifically, Kates recalled that he called McMillen to report the problem, and that he (Kates) went to the machine room after McMillen. England was not in the machine room when Kates got there. According to Kates, England arrived approximately five to ten minutes later. Kates recalled that McMillen told England to meet the occupants of the elevator in the basement.

In addition to discussing whether England was in the machine room, Kates testified, as noted above, that McMillen later revealed to him that McMillen believed "there was somebody else in there" and that this "somebody" had walked by the overspeed switch and tripped it by mistake. Kates gave no indication as to who this unknown "somebody" was, nor did he testify if McMillen gave any indication as to the identity of the person.

### D. THE NATURE OF MICHELE'S ALLEGED INJURIES

Michele received medical attention at the emergency room at Harper Hospital shortly after the accident. Records indicate that her primary complaint at the time was knee pain and mild back pain. Michele testified that she reported neck pain as well, and a hospital incident report indicates that Michele indicated "neck pain." A few days later, Michele received treatment at a clinic and received a cane because she had difficulty walking. In November 2010, a few months after the incident, Michele recalled that her mobility was restricted and she had what she described as severe pain and numbness in her neck, right shoulder, and fingers. She continued working until January 2010, at which point it was determined that she was disabled and could not work. She was diagnosed with herniated discs in her neck following the elevator incident. Michele testified that multiple doctors opined that the herniated discs were caused by the incident, specifically when she struck the wall of the elevator car. Dr. Paul Cullis, the doctor who declared Michele disabled, testified in his deposition that "[t]he elevator accident caused the disc herniation, which caused the compression of [Michele's] spinal cord." Michele had surgery in November 2012 and used a walker for several months.

Defendant's expert, Albert King, Ph.D., testified that he is an expert in biomechanics and neurophysiology of back pain, but he is not a medical doctor. According to King, it was possible to recreate similar conditions caused by the rope gripper stopping an elevator, but it was impossible to recreate precisely what happened to Michele in elevator 10. He explained at his deposition that a rope gripper is a friction device that "clamps against the ropes and produces an extremely rapid abrupt stop." In an experiment, King stood in an elevator to test the rope gripper's effect on the elevator as it descended. He used two accelerometers—one attached to the rail of the elevator car and one attached to a tongue depressor between his teeth. The accelerations measured were "well below the accelerations experienced in activities of daily

living, such as jogging, plopping down into a chair or hopping off a step. When King was in the elevator and it stopped with the rope gripper twice, he "didn't feel anything." Regarding Michele's description of hitting her knee on the side of the elevator, King opined that the account was "greatly exaggerated."

King agreed that if a doctor opined in his or her medical opinion that the accident caused Michele's disc injury, he could not disagree with that. But he concluded from a biomechanical standpoint that the accident did not cause such a disc injury. King opined that Michele had pre-existing degenerative changes in her cervical spine.[8]

## E. PROCEDURAL HISTORY

Plaintiffs filed their complaint against Otis and the hospital defendants.[9] Pertinent to the present appeal, plaintiffs alleged negligence and loss of consortium. With regard to negligence, plaintiffs claimed that defendants were negligent for failing to cover, guard, or otherwise protect the overspeed switch, failing to keep the machine room doors closed and/or locked, and failing to restrict access to the machine room.

Otis moved for summary disposition pursuant to MCR 2.116(C)(10). Otis characterized plaintiffs' theory of the case as one claiming that Otis was negligent for allowing the "mystery man" McMillen saw in the machine room access to the room, after which the "mystery man" tripped the overspeed switch. Otis argued that England's testimony refuted such a theory, as he testified that no one was around the overspeed switch at the time of the incident. Given England's testimony, Otis argued that plaintiffs' theory of the case was, at best, speculative, because even Christiaens, plaintiff's expert, acknowledged that he did not know how the incident occurred and admitted that any opinion he could offer in this regard would be speculative. Thus, Otis argued that plaintiffs' theory of causation was speculative and her claim must be dismissed. Otis also argued that negligence could not be inferred through *res ipsa loquitor* because the activation of a safety device is not ordinarily associated with negligence and the instrumentality at issue in this case was not within Otis's exclusive control. Otis also claimed that its biomechanical engineering expert, Dr. King, presented what it described as unrebutted testimony opining that it was scientifically impossible for Michele to be injured in the way she claimed.

Following a November 21, 2014 hearing, the trial court denied the motion. On March 31, 2015, this Court granted Otis's application for leave to appeal the trial court's summary

---

[8] However, there was no evidence of such problems in her medical history.

[9] After Otis filed a notice of non-party fault, plaintiffs added Hollister-Whitney as a defendant. Plaintiffs later agreed with contentions by Hollister-Whitney that summary disposition as to Hollister-Whitney was appropriate because there was no evidence that the overspeed switch was defective; the trial court granted summary disposition to Hollister-Whitney and there are no issues on appeal with regard to that grant of summary disposition. Additionally, we note that appears that plaintiffs settled their claims with the hospital defendants. The current appeal only pertains to plaintiffs' claims against Otis.

disposition ruling. *Holt v Legacy HHH*, unpublished order of the Court of Appeals, entered March 31, 2015 (Docket No. 325345).

## II. ANALYSIS

On appeal, Otis argues that plaintiffs failed to establish proximate causation to support their prima facie case of negligence, and therefore, the trial court erred by denying its motion for summary disposition. We disagree.

## A. STANDARD OF REVIEW

Otis's motion for summary disposition was pursuant to MCR 2.116(C)(10), which tests the factual sufficiency of a complaint. *Urbain v Beierling*, 301 Mich App 114, 122; 835 NW2d 455 (2013).

> In evaluating a motion for summary disposition brought under Subrule (C)(10), a reviewing court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion. Summary disposition is properly granted if the proffered evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. [*Klein v HP Pelzer Auto Sys, Inc*, 306 Mich App 67, 75; 854 NW2d 521 (2014).]

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003).

## B. CAUSATION—OTIS'S CONDUCT AND THE INCIDENT

To establish their negligence claim, plaintiffs must prove that (1) Otis owed plaintiffs a duty; (2) Otis breached that duty; (3) causation; and (4) plaintiffs suffered damages. *Quinto v Woodward Detroit CVS, LLC*, 305 Mich App 73, 75; 850 NW2d 642 (2014). The only issue in the motion concerned the third element, causation. To prove causation, plaintiffs must present proof of both cause in fact and proximate cause. *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009). To establish cause in fact, plaintiffs must present sufficient evidence to allow the jury to conclude that more likely than not, the injuries would not have occurred but for Otis's negligence. *Id*. at 417-418. Proximate cause has been defined as " 'a foreseeable, natural, and probable cause.' " *Jones v Detroit Med Ctr*, 490 Mich 960; 806 NW2d 304 (2011) (citation omitted). Otis takes issue with the sufficiency of plaintiffs' evidence to prove cause in fact, being why the rope gripper stopped the elevator Michele was riding in at the time of the incident.

Cause in fact may be proved through circumstantial evidence, but that evidence " 'must facilitate reasonable inferences of causation, not mere speculation.' " *Genna*, 286 Mich App at 417-418, quoting *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). An explanation that is consistent with the known facts, but not deducible from those facts as a reasonable inference, is a "conjecture." *Skinner*, 445 Mich at 164. There might be more than one possible explanation for an occurrence, but if the evidence does not point to any one of them as the theory of causation, then they remain conjecture. *Id*. If, on the other hand, there is

evidence that " 'points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such determination,' " even though other plausible theories exist. *Id*., quoting *Kaminski v Grand Trunk WR Co*, 347 Mich 417, 422; 79 NW2d 899 (1956).

The *Skinner* Court further explained how circumstantial evidence may permit a reasonable inference of causation:

> [A]t a minimum, a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. [*Id*. at 164-165.]

The Court pointed to a number of cases applying this standard to a plaintiff's proof of cause in fact in negligence cases. *Id*. at 165-167. It stated its agreement with 57A Am Jur 2d, Negligence, § 461, p 442:

> All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Absolute certainty cannot be achieved in proving negligence circumstantially; but such proof may satisfy where the chain of circumstances leads to a conclusion which is more probable than any other hypothesis reflected by the evidence. However, if such evidence lends equal support to inconsistent conclusions or is equally consistent with contradictory hypotheses, negligence is not established. [*Skinner*, 445 Mich at 166.]

Otis, as the party moving for summary disposition, had the burden of presenting documentary evidence to support its motion. See *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 281; 807 NW2d 407 (2011). Plaintiffs' theory of the case was that Otis was negligent for failing to safeguard the overspeed switch, which allowed the unknown individual to contact the overspeed switch. Alternatively, plaintiffs argued that Otis was negligent for failing to secure the machine room, which allowed an unknown individual to make contact with the overspeed switch. Otis, which moved for summary disposition on the grounds that there was no genuine issue of fact as to cause in fact and that plaintiffs' theories were speculative, met its initial burden of going forward. In this regard, Otis presented testimony from McMillen that there were multiple causes that could have led to the overspeed switch being tripped. Specifically, McMillen testified that the switch could have been tripped manually, or through vibration of the elevator car and/or the hospital building. Thus, according to Otis's evidence, plaintiffs' theory—that someone negligently contacted the overspeed switch—was just as likely as the theory that vibration caused the overspeed switch to trip.

In addition, defendant presented deposition testimony from England, who testified that he was in the machine room at the time of the incident. According to England, although there were Otis employees in the room, no one was near the overspeed switch for elevator 10. This

testimony negated the idea that anyone—an Otis employee or otherwise—negligently contacted the overspeed switch.

Given the evidence defendant presented, the burden shifted to plaintiffs to produce evidence in support of its causation theories of liability. Again, in evaluating this issue, we view the evidence in a light most favorable the non-moving party, which in this case was plaintiffs. *Klein*, 306 Mich App at 75; *Huron Mountain Club v Marquette Co Rd Comm*, 303 Mich App 312, 321-322; 845 NW2d 523 (2013). On the record before us, we agree with the trial court that plaintiffs satisfied their burden under MCR 2.116(C)(10) and that they created a genuine issue of fact—beyond speculation—that Otis was the cause in fact of Michele's injuries. We analyze this issue by first considering whether there was circumstantial evidence to support plaintiffs' theory that physical contact with the overspeed switch caused it to trip, and then examine whether there was sufficient evidence to support plaintiffs' theory that either: (1) Otis was negligent in failing to cover or otherwise secure the overspeed switch; or (2) Otis was negligent in failing to secure the door to the machine room.

As an initial matter, plaintiffs produced circumstantial evidence to facilitate reasonable inferences that the overspeed governor was tripped manually, meaning that someone contacted the switch, causing the switch to trip and the rope gripper to deploy. Plaintiffs presented deposition testimony from Christiaens, an expert witness, who testified he was aware that McMillen's testing of the overspeed switch ruled out an overspeed condition, i.e., the switch did not engage because the elevator had traveled too fast. Christiaens was also aware that investigations performed by Otis employees, including McMillen, ruled out the possibility of a power failure as a cause for the tripping of the overspeed switch. Based on these circumstances, and his own research, Christiaens opined that the overspeed switch had to have been tripped manually, i.e., someone tripped the switch.

In regard to Christiaens's testimony, Otis claims that it cannot be used to demonstrate adequate proof of causation because Christiaens himself admitted that his opinion was "speculation." We disagree with Otis's portrayal of Christiaens's testimony. Christiaens testified that, under the facts of this case, the only way the overspeed switch could have been tripped, since the elevator did not overspeed, was through manual contact. Christiaens testified that he relied on McMillen's diagnostic testing to arrive at this conclusion. In challenging how Christiaens arrived at this conclusion, Otis's counsel asked Christiaens whether he had read England's testimony in which he stated that no one was near the overspeed switch at the time of the incident. Christiaens testified that he had read England's testimony, which prompted the following exchange with counsel:

> *Q.* In other words, [England's testimony contradicted] Mark [McMillen[10]]?

---

[10] The transcript uses the spelling "McMillan." This opinion uses the spelling "McMillen," because that was the spelling utilized during McMillen's own deposition.

*A.* Yes.

*Q.* Did you rule that out or—

*A.* I thought the testimony between Mark [McMillen] and Roy England were [sic] inconsistent.

*Q.* So did you rule one out or not?

*A.* I think I may have ruled out Roy England.

*Q.* Did you or didn't you? I guess I need to know today.

*A.* Well, not being there and not knowing the circumstances, it's only speculation.

*Q.* Right, I know it's speculation, but they both would be speculation, would you agree?

*A.* They both could be. It's still speculation to me.

*Q.* It is speculation to you?

*A.* Yes.

*Q.* Thank you. So would you agree that you can't say to a reasonable degree of certainty how the incident occurred?

*A.* I cannot say that.

In context, Christiaens did not testify that he was speculating as to how the overspeed switch was tripped. Rather, his use of the word "speculation" was in regard to whether he believed the testimony of England—who testified that no one was near the overspeed switch for elevator 10—or McMillen—who testified in a manner that ruled out other possible causes regarding how the overspeed switch tripped. It was appropriate for Christiaens to rely on McMillen's testimony in forming his opinion. See MRE 703.

Furthermore, even without Christiaens's testimony about what caused the overspeed switch to trip, there was other testimony supporting plaintiff's theory that the switch was tripped manually. Notably, Dietrich testified that the overspeed switch at issue was designed so as to avoid deploying due to vibration, which is contrary to McMillen's testimony concerning whether vibration could have caused the overspeed switch to trip in this case. Dietrich was aware that prior to the overspeed switch being tripped and the rope gripper deploying in this case, elevator 10 had not oversped. In light of these conditions, Dietrich testified that the only thing that could have caused the overspeed switch to trip was physical contact with the switch. Moreover, Kates testified that McMillen told him that he thought the overspeed switch was tripped when someone hit it by mistake, based on McMillen's observation of a person in the machine room before the incident.

-11-

In sum, we find no merit in Otis's position that the testimony provided by Christiaens and other witnesses was speculative or without any factual basis. Plaintiffs presented ample evidence to rule out the possibility of other potential causes for the overspeed switch to trip, leading Christiaens and Dietrich to conclude, under the known facts, that the overspeed switch must have been tripped manually. And, contrary to Otis's contentions, plaintiffs also presented evidence that someone was in the machine room at the time the overspeed switch was manually tripped. Although Otis presented testimony from England in support of its claim that no one was near the overspeed switch at the time of the accident, plaintiffs presented testimony that England was not in the machine room at the time of the incident. Art testified that he was working with England on the other side of the hospital at the time of the incident. McMillen and Kates testified that they arrived in the machine room after the incident and that England arrived after they were already there. Moreover, Kates testified that McMillen admitted to him that he believed, based on the facts and potential causes for the overspeed switch being tripped, that an unknown individual tripped the overspeed switch. Hence there was circumstantial evidence to support plaintiffs' theory of manual tripping, and we reject Otis's contentions that this theory was speculative. In this regard, we find Otis's reliance on this Court's nonbinding decision in *Wulff v Otis Elevator Co*, unpublished opinion per curiam of the Court of Appeals, issued September 6, 2011 (Docket No. 297317), a case Otis's postulates is "remarkably similar" to the instant case, to be misplaced. The expert's opinion in *Wulff* was speculative because it lacked any basis in known facts and it was merely possible, not probable. That is not the case here.

Otis contends on appeal that there was no evidence to suggest that the unknown person McMillen saw in the machine room was an Otis employee, and that this precludes plaintiffs from showing that but for Otis's allegedly negligent conduct, plaintiffs' resultant injuries would not have occurred. However, that argument misses the mark. Plaintiffs' theories of liability were premised on the idea that Otis was liable for not covering the overspeed switch, and, in the alternative, that Otis was negligent for allowing the door to the machine room to be propped open. Neither of these theories is premised, nor are they reliant on, the notion that the unknown individual was an Otis employee. Thus, whether the unknown individual was an Otis employee, has no bearing on our ruling. Moreover, we conclude, on the record before us, that there was a question of fact concerning whether the unknown individual was an Otis employee. As noted, the machine room was located on the 11th floor of the hospital, access to which was restricted by an access-only elevator and stairway. Access to the machine room was even further restricted to a small group of individuals with keys. McMillen testified that an unknown individual entered the machine room shortly before the incident and remained in the room immediately after the incident. Although McMillen initially testified that this person was not wearing an Otis uniform, he later admitted that he did not know what color uniform the individual wore, and that the only thing he knew about the person was that he was male. Further, plaintiffs presented testimony from hospital personnel that only Otis personnel were permitted to enter the machine room unattended. James McIntyre, the director of facility engineering at the hospital, testified that "Otis controls their machine rooms" and that he could not envision a scenario where anyone would be in the machine room without Otis permission. McIntyre further testified that "it just wouldn't happen" with regard to whether a contractor would have been in the machine room alone at the time of the incident. He said this because "Otis controls their machine rooms. We— and that would include our contractors—don't stroll into their machine rooms." Murdock testified that he had never been to the machine room without Otis's authorization or

-12-

coordination, and that in his experience, hospital employees who were in the machine room were accompanied by an Otis employee. Further, hospital personnel testified that the only reason a hospital employee would access the machine room was to perform maintenance or to accompany a city inspector during an inspection, and that there was no maintenance or inspections being done on the day of the incident. There was also testimony from Otis employees—Kates and McMillen—that the Otis modernization crew, which was not always at the hospital, was at the hospital, working on elevators, and occasionally entering the machine room, on the day of the incident. In sum, plaintiffs presented testimony that access to the machine room, and the 11th floor in general, was restricted. Plaintiffs presented testimony that an unknown male individual went into the machine room and was present, alone, immediately after the incident occurred. Thus, it could be inferred that this unknown person was in the machine room during the incident. Further, plaintiffs presented evidence from which a rational juror could infer that this person was an Otis employee. Indeed, McMillen admitted he was not sure what color uniform the person was wearing. There was also testimony that only Otis employees went to into the machine room alone, and that this person was alone in the machine room. Moreover, there was testimony that hospital employees who went to the machine room did so accompanied by an Otis employee; again, the presence of a lone individual in the machine room allows the inference that the person was an Otis employee.

We next turn our attention to plaintiffs' allegations as they concern Otis's conduct. That is, did plaintiffs present evidence which affords a reasonable basis for a jury to conclude that, more likely than not, but for Otis's conduct, Michele's injuries would not have occurred? See *Skinner*, 445 Mich at 164-165. On the record before this Court, we find that plaintiffs presented such evidence. Plaintiffs advanced two theories: (1) Otis was negligent for failing to cover or secure the overspeed switch in this case; and (2) Otis was negligent for failing to secure the machine room doors, specifically, for propping open the door through which the unknown individual entered. Plaintiffs presented sufficient evidence to survive a motion for summary disposition under MCR 2.116(C)(10) on both of these theories. Regarding the first theory, several witnesses testified concerning how easily the overspeed switch could be tripped and that it could be tripped through inadvertent contact, such as accidentally brushing up against the switch. For instance, Kates testified that the switch—which was designed to abruptly stop a moving elevator—could be tripped with a single finger. Here, as to plaintiffs' first theory of Otis's liability, plaintiffs presented tesimony: (1) that an unknown individual was in the machine room at the time of the incident; (2) that the only plausible cause for the overspeed switch to have been tripped was through contact by an individual who was in the room at the time of the accident; and (3) the ease with which the overspeed switch could be tripped accidentally. In essence, plaintiffs presented evidence that Otis left completely unguarded a device that could bring an elevator to a sudden stop and that could easily be tripped by a passerby with little to no effort. They also presented evidence that the only possible cause of the injury was that someone made contact with the switch, and that there was an individual in the room at the time of the incident. It could be rationally inferred from this compilation of evidence that the failure to cover or otherwise secure the overspeed switch was a but-for cause of Michele's injuries.

As to plaintiffs' alternate theory, there was no dispute that the main door to the machine room was propped open on the day of the incident. McMillen was not aware whether any Otis employees had keys to the machine room and testified that none of the members of his

-13-

modernization crew had their own keys. He testified that his crew would have had to ask hospital personnel for access to the machine room, but the machine room door was already propped open on the day of the incident. Further, only a very small group of hospital employees—none of whom were alleged to have been in the machine room on the day of the incident—had keys to the machine room. There was no evidence that any hospital employees or outside contractors were working in the machine room on the day of the incident. Furthermore, England testified that if he got to the machine room in the morning before the modernization crew, he would prop the door open for them. McMillen testified that he walked by the machine room shortly before the incident, saw the door was propped open, despite the fact that it was not supposed to be propped open, and did nothing about it. In fact, he even saw someone walk through the door and did nothing about it. He did nothing, despite the fact that McIntyre testified that Otis personnel could ask unauthorized persons to leave the machine room. And, importantly, the machine room door was propped open mere moments before an unknown individual entered the machine room and elevator 10 was stopped, according to plaintiffs' evidence, by an overspeed switch that was tripped manually, i.e., by someone in the machine room.

In light of the deposition testimony noted above, plaintiffs presented evidence that the person who entered the machine room only did so because the door was propped open. Indeed, plaintiffs presented evidence that the only Otis employee with keys to the machine room was England, and that England was not in the machine room at the time of the incident. They also presented testimony that only a select group of hospital employees had keys, and there was no indication that any of those employees were in the machine room on the day of the incident. Accordingly, the unknown individual who entered the machine room was either an Otis employee without the means to enter the machine room or he was a non-Otis employee who otherwise had neither the means nor a reason to be in the machine room at the time of the incident. Thus, there was ample circumstantial evidence that the unknown individual gained access to the machine room because an Otis employee with keys either propped the door open or permitted the door to be propped open and that the unknown individual did so mere moments before an overspeed switch was tripped manually. Plaintiffs presented enough evidence to overcome a motion for summary disposition on the issue of causation because there was evidence from which a jury could conclude that, more likely than not, but for the conduct of permitting the door to be propped open, the injury would not have occurred.

## C. CAUSATION—PLAINTIFFS' INJURIES

Next, Otis argues that the elevator incident could not have caused the types of injuries Michele alleged. The trial court rejected these claims, finding that Otis essentially raised credibility arguments about whose witnesses should be believed. We agree with the trial court's assessment.

Otis first disputes Michele's account of the elevator drop and contends that it was implausible for Michele to have been thrown around in the manner she contends occurred. It also argues that King's testimony—that the mechanical forces involved in the elevator fall could not have caused the types of injuries Michele alleged—rendered plaintiffs unable to demonstrate that the incident caused Michele's alleged injuries.

The thrust of King's testimony was that Michele's herniated disc could not occur from one incident without a coincidental fracture. Because Michele's medical records did not reveal any fractures, King, who was not a medical doctor, opined that the herniated disc was not caused by the elevator injury. However, plaintiffs presented testimony from Michele's treating physicians indicating that her herniated disc was caused by the elevator incident. Setting aside the idea that King was not a medical doctor, we find that, at most, Otis has identified a question of fact. This is an issue for the jury, not an issue for summary disposition. See *Klein*, 306 Mich App at 75.

Otis's arguments about whether the elevator fall could have tossed Michele about the elevator in the manner she alleged suffer from the same flaw. King conducted an experiment and measured the g-forces generated when elevator 10 was stopped with the rope gripper. According to King, the g-forces were below "the accelerations experienced in activities of daily living, such as jogging, plopping down into a chair or hopping off a step." King also testified that he "didn't feel anything" when the elevator stopped suddenly during his testing.[11] Otis also points to Hester's testimony wherein she stated that she did not recall the incident.[12]

Once again, we find that Otis failed to demonstrate that there was no genuine issue of material fact. In contrast to King and Hester's testimony, plaintiffs presented testimony from Michele, who alleged that the unexpected stopping of elevator 10 caused her to be thrown around inside the elevator and to lose her balance, while Hester was holding onto a cart at the time. The conflicting testimony is a matter for a jury to resolve, and is not appropriate for summary disposition. See *Klein*, 306 Mich App at 75.

### III. CONCLUSION

We find that the trial court did not err when it denied Otis's motion for summary disposition. Accordingly, we affirm.

/s/ Patrick M. Meter
/s/ Jane M. Beckering

---

[11] King admitted in his deposition that, unlike Michele, he was prepared for the elevator to stop and had an opportunity to brace himself for the fall, and further, it is possible that a person riding in an elevator will not be standing with a stable posture.

[12] An incident report prepared by security guard Robert Walker indicates that Hester verified that the event occurred.