# STATE OF MICHIGAN

# COURT OF APPEALS

SGT. BRIAN SCHAEFER,

        Plaintiff-Appellant,

v

PLYMOUTH TOWNSHIP and THOMAS J.
TIDERINGTON,

        Defendants-Appellees.

UNPUBLISHED
November 10, 2016

No. 328054
Wayne Circuit Court
LC No. 14-001889-NZ

Before: TALBOT, C.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Plaintiff appeals as of right an order granting defendants summary disposition in plaintiff's claim brought under Michigan's Whistleblower's Protection Act (WPA), MCL 15.361 *et seq.* Finding no error warranting reversal, we affirm.

## I. BASIC FACTS

Plaintiff Sergeant Brian Schaefer (Schaefer) sued defendants, Plymouth Township (the township) and Chief of Police Thomas J. Tiderington (Tiderington), alleging that he was wrongfully terminated as a result of answers that he gave during a mandatory interview with township attorneys Laura Amtsbuechler and Chris Johnson in connection with a lawsuit brought by another officer, Brittany DeFrain, against the township (the DeFrain lawsuit). DeFrain had sued the township for sexual discrimination after the township extended her probationary work period beyond the traditional one-year period as a result of a relationship she had with a fellow married officer, Scott Linton.

Schaefer was a sergeant who supervised Linton as well as Officer Stephen Albrecht and who also supervised DeFrain during her field training. In his August 2013 interview with township attorneys, Schaefer denied knowing that DeFrain and Linton were in a relationship. Schaefer also told the attorneys that, in his opinion, Tiderington should not have extended DeFrain's probationary period because such an extension was simply unheard of. Schaefer believed that DeFrain should have either been hired or fired. Shortly after this meeting, Tiderington and his administrative lieutenant, Jon Brothers, began an internal investigation of Linton and Albrecht. Mobile data messaging had revealed that both Linton and Albrecht routinely slept on duty and that Linton was covering up his affair with DeFrain. There was one message from Linton to DeFrain indicating that "Schaef's at home, now we can meet to kiss."

-1-

Tiderington was concerned that Schaefer was at home at that time because it indicated a "manpower" issue, so he asked Brothers to investigate why Schaefer was home when he should have been on duty. Brothers determined that there was no explanation for Schaefer being home. Additionally, Schaefer had been turning off his patrol car's computer system, so, unlike his fellow officers, there was no accounting for Schaefer's whereabouts. A GPS device was placed on the shared patrol car and revealed that Schaefer routinely went home for extended periods of time while he was on duty. Tiderington charged Schaefer with a number of policy and rules violations and Schaefer was fired in December 2013. He filed a union grievance but the arbitrator determined that there was just cause for firing Schaefer and the dismissal was upheld.

Schaefer filed his complaint on February 14, 2014, alleging that he was terminated because of his truthful answers to mandated participation in the DeFrain investigation wherein Schaefer criticized Tiderington's handling of DeFrain's probationary status, denied knowledge of a sexual relationship between DeFrain and Linton, and suggested that married officers who were friends of Tiderington's were involved in sexual relationships with female employees.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10). They argued that Schaefer was not involved in a "protected activity" because there was no evidence that Schaefer ever participated in a court action; his meeting with township attorneys was not conducted by a public body. Additionally, defendants argued that there was no causal connection between Schaefer's alleged protected activity and his termination. Schaefer could point to no evidence to factually demonstrate a causal link between his interview with the attorneys and his termination; instead, Schaefer offered mere speculation. Defendants pointed out that there was no evidence that Tiderington even knew what Schaefer said in the interview. Defendants maintained that Schaefer could not show that the proffered reason for his termination was mere pretext when Schaefer, in fact, acknowledged his wrongdoing and only took issue with the severity of his discipline.

The trial court agreed that Schaefer failed to bring forth any evidence that defendants' proffered reasons for firing Schaefer were pretextual and that retaliation was a motivating factor. The trial court entered an order in defendants' favor on June 3, 2015. Schaefer now appeals as of right.

## II. STANDARD OF REVIEW

"We review de novo motions for summary disposition brought under MCR 2.116(C)(10)." *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). Under that rule, summary disposition is appropriate when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10).

> A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. The moving party must specifically identify the matters that have no disputed factual issues, and it has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The party opposing the motion then has the burden of showing by evidentiary materials that a genuine issue of disputed material fact

exists. The existence of a disputed fact must be established by substantively admissible evidence, although the evidence need not be in admissible form. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. [*Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440–441; 814 NW2d 670 (2012) (internal citations omitted).]

"Because a motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, the circuit court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).

## III.  ANALYSIS

Schaefer argues that the trial court erred in granting defendants summary disposition.  We disagree and conclude that the trial court properly granted defendants summary disposition where Schaefer failed to raise a genuine issue of material fact regarding the causal connection between his protected activity and his firing.

MCL 15.362 provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Here, Schaefer claims that he was a "Type 2" whistleblower.  Our Court has explained:

The plain language of the statute provides protection for two types of "whistleblowers": (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action. On the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. In other words, we see type 1 whistleblowers as initiators, as opposed to type 2 whistleblowers who participate in a previously initiated investigation or hearing at the behest of a public body. If a plaintiff falls under either category, then that plaintiff is engaged in a "protected activity" for purposes of presenting a prima facie case. [*Henry v City of Detroit*, 234 Mich App 405, 409–410; 594 NW2d 107 (1999).]

Our Supreme Court has identified the elements necessary for a prima facie case under the WPA:

> Drawing from the statutory language, this Court has identified three elements that a plaintiff must demonstrate to make out a prima facie case that the defendant employer has violated the WPA:
>
> (1) The employee was engaged in one of the protected activities listed in the provision.
>
> (2) The employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment.
>
> (3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee. [*Wurtz v Beecher Metro Dist*, 495 Mich 242, 250–252; 848 NW2d 121, reh den 495 Mich 1010 (2014) (internal footnotes omitted).]

Although defendants argued that Schaefer was not engaged in a protected activity when he met with township attorneys, we decline to address whether Schaefer was, in fact, engaged in a protected activity, where the trial court did not directly rule on the issue. Given the fact that he was fired, Schaefer obviously satisfied the second element of a prima facie WPA claim. At issue, then, is whether there was a genuine issue of material fact as to whether a causal connection existed between Schaefer's protected activity and his termination.

"Because whistleblower claims are analogous to other anti-retaliation employment claims brought under employment discrimination statutes prohibiting various discriminatory animuses, they should receive treatment under the standards of proof of those analogous claims," including the burden-shifting framework set forth in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). *Debano-Griffin v Lake Co*, 493 Mich 167, 175–176; 828 NW2d 634 (2013) (internal quotation marks and citations omitted). Therefore, where, as here, there is no direct evidence of retaliation, a plaintiff may rely on indirect evidence of his employer's motivations to show that "a causal link exists between the whistleblowing act and the employer's adverse employment action." *Id.* at 176. A plaintiff may accomplish this by presented "proofs from which a factfinder could *infer* that" plaintiff was the victim of retaliation. *Id.* After a plaintiff has come forward with such evidence, a presumption of retaliation arises. *Id.* An employer may nevertheless be entitled to summary disposition if "it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a motivating factor for the employer's adverse action." *Id.* After an employer articulates a legitimate reason for the action, the burden shifts back to the plaintiff to establish that the proffered reason was merely a pretext for unlawful retaliation. *Id.*

"A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Taylor v Modern Engineering, Inc*, 252 Mich

App 655, 660; 653 NW2d 625 (2002). However, "[s]ummary disposition for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action" and a plaintiff "must show something more than merely a coincidence in time between protected activity and adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 184, 186; 665 NW2d 468 (2003).

Schaefer points to the temporal relationship between his meeting with township attorneys in August 2013, the staff investigation and meeting in September 2013, and his firing in December 2013. The meeting with the township attorneys no doubt set in motion the events that ultimately led to Schaefer's termination, but not in the way Schaefer would have the trial court believe. Schaefer implies that Tiderington engaged in a surreptitious witch hunt after learning about Schaefer's statements but the record does not support such a conclusion; instead, it is clear that the focus of the internal investigation was Linton and Albrecht, with Schaefer factoring in in a minor way.

Even viewing the evidence in a light most favorable to Schaefer, Schaefer has failed to present sufficient evidence to create a genuine issue of material fact regarding a causal connection between the protected activity and his termination. Defendants proffered legitimate business reasons for firing Schaefer based on his flagrant violation of rules and policies and his inability to properly supervise Linton and Albrecht, which allowed them to likewise disregard and neglect their duties. Schaefer readily admitted that he and his wife were having problems after the birth of their second child and that he felt compelled to go home while on duty to help her. Schaefer's home was beyond the bounds set for leaving the township. Additionally, even if Schaefer's testimony is believed that he did not purposefully turn off the patrol car's computer system to hide his whereabouts, the fact remained that Schaefer was the only sergeant whose whereabouts could not be determined. As a result, a GPS device was placed on the patrol car. Contrary to Schaefer's repeated reference to the car as "his," the evidence clearly reveals that this was a patrol car shared by all the sergeants. Once the GPS device was placed on the patrol car, the department learned that there were at least two incidents in which Schaefer was home for extended periods of time while on duty and that he responded to at least two calls from home. On one such occasion, Schaefer drove over 90 miles per hour and did not activate his overhead lights until he was back in the township. Even if Schaefer is believed and this was merely a coincidence, the fact remains that the department was justified in concluding that Schaefer had a habit and pattern of spending large blocks of time at home and actively undertook to hide his location from the department. Obviously, Schaefer's focus was not on his professional obligations as a supervising sergeant and his lack of attentiveness allowed Linton and Albrecht to run amok. Schaefer also admitted to occasions in which dispatch was unable to contact him because he was engaged in personal errands while on duty. In addition, Schaefer admitted that he routinely stopped by his business in direct contravention of Tiderington's orders. Other flagrant policy violations included Schaefer or other officers driving Schaefer's drunken friends home.

Because there was a legitimate business reason for Schaefer's firing, it was incumbent upon Schaefer to provide sufficient evidence to create a genuine issue of material fact as to why those reasons were pretextual. Schaefer failed to do so because he attempted to create evidence by inference, meaning Schaefer asked the trial court to simply determine that neither Amtsbuechler nor Tiderington were credible. It is true that "[c]ircumstantial evidence can be

evaluated and utilized in regard to determining whether a genuine issue of material fact exists for purposes of summary disposition," *Bergen v Baker*, 264 Mich App 376, 387; 691 NW2d 770 (2004), but Schaefer's "evidence" falls far short of creating an issue of fact.

Amtsbuechler explained that her interview with Schaefer was an attempt to understand why DeFrain had resigned as well as determine the extent of Schaefer's knowledge regarding the relationship between Linton and DeFrain. Much of the information she received was information she already knew. Amtsbuechler did not know, nor did she care, what Schaefer's personal opinions were about whether DeFrain's extension was appropriate. She only wanted to know about DeFrain's performance. Something about Schaefer's demeanor led Amtsbuechler to believe that he was not telling the truth when he denied knowing that Linton and DeFrain were in a relationship. When she spoke to Tiderington after the interviews, Amtsbuechler told Tiderington that she did not believe Schaefer was being totally honest. Amtsbuechler testified that Schaefer's honesty, or lack thereof, was "the only thing that" she talked to Tiderington about.

On appeal, as in the trial court, Schaefer argues that Amtsbuechler's testimony was not worthy of belief. However, Schaefer does not explain how Amtsbuechler's testimony was "self-serving" or what Amtsbuechler would gain in lying about what she told Tiderington. Instead, Schaefer simply believes Amtsbuechler was lying and asked the trial court to draw the same conclusion.

Schaefer similarly attacked Tiderington's credibility. Tiderington testified that Amtsbuechler did not tell him that Schaefer told Amtsbuechler that it violated the field training program protocol for Tiderington to extend DeFrain's probationary period. Tiderington testified that he only learned that Schaefer believed the statements made to Amtsbuechler were related to the firing when Tiderington saw Schaefer's lawsuit.

> *Q.* Okay. did Ms. – Laura – did she tell you that Schaefer had been critical of you for not conferring with him regarding extending Defrain's probationary period?
>
> *A.* Never had that conversation with her, ever.
>
> *Q.* Okay. Did Laura – and when I say Laura let me include Mr. Johnson also. He didn't tell you anything like that?
>
> *A.* He did not.
>
> ***
>
> *Q.* Isn't it true that you fired Schaefer because you didn't like what it is he said during the meeting with the attorneys?
>
> *A.* That's the most absurd thing that I've ever heard. . . .And to clarify that, that never happened.
>
> ***

*Q*. Isn't it true that you investigated Schaefer to the extent that you did because of what he told the attorneys in that meeting?

*A*. That's absolutely false. I assigned his friend to investigate him, a man of unquestioned integrity. He conducted the staff inspection. I didn't conduct it. There's no question that whatever Jon Brothers wrote down was factual.

Schaefer never came forward with a shred of evidence that his comments to the township attorneys regarding the extension of DeFrain's probation were communicated to Tiderington. Critically important, Schaefer had no direct knowledge of what the attorneys communicated to Tiderington.

*Q*. And do you have any information from any other source as to what the attorneys Johnson and Amtsbuechler, told the chief about your conversation?

*A*. I have no direct information.

*Q*. Either written or verbal?

*A*. Correct.

*Q*. So, other than what you – your speculation or what you think, you have no direct knowledge or information about what they communicated to the chief, "they" meaning the attorneys?

*A*. Other than my strong beliefs on what happened.

*Q*. So, there's no factual basis for that other than your strong beliefs; is that correct?

*A*. I believe there's a factual basis, yes, there's –

*Q*. On a factual basis as to what somebody told you or what you read?

*A*. Yes. No direct verbal or written.

Such "speculation" and "conjecture" were insufficient to raise a genuine issue of fact. *Skinner v Square D Co*, 445 Mich 153, 172-173; 516 NW2d 475 (1994); *Ghaffari v Turner Const Co*, 268 Mich App 460, 465; 708 NW2d 448 (2005).

Contrary to Schaefer's assertions, the trial court did not weigh the credibility of the witnesses but simply considered the absence of contrary evidence. It is certainly true that witness credibility is a question of fact for the jury to decide, but there was no genuine issue of fact remaining because there were not two competing versions of what occurred. Instead, both Amtsbuechler and Tiderington denied that Schaefer's comments about DeFrain's extension were communicated to Tiderington. In response, Schaefer came forth with no contrary evidence other than his "strong beliefs." This was not a situation where summary disposition was inappropriate because Tiderington's subjective motivation was at play, see *Pemberton v Dharmani*, 207 Mich

App 522, 529 n 1; 525 NW2d 497 (1994) ("summary disposition is inappropriate where questions of motive, intention, or other conditions of the mind are material issues"), nor is this a situation that involved "crucial credibility determinations," *White v Taylor Distributing Co, Inc,* 275 Mich App 615, 631; 739 NW2d 132 (2007), aff'd 482 Mich 136 (2008). This is a situation where there was *no* evidence that the information was ever conveyed and, as such, Tiderington could not have been motivated to retaliate against Schaefer. When Schaefer's "speculative testimony is disregarded, the only testimony that remains is" that of Tiderington and Amtsbuechler. *Ghaffari*, 268 Mich App at 465.

While certain circumstances might present issues of fact or credibility that preclude summary disposition even in the absence of specifically refuting documentary evidence, *White*, 275 Mich App at 626, 628, this is not such a situation, especially where Schaefer has repeatedly admitted to his own wrong-doing. He repeatedly conceded that his behavior formed the basis for some sort of discipline. Schaefer's allegation that there was pretext thus rings hollow. Especially in light of Schaefer's counsel's statement at Schaefer's deposition when the attorneys were fighting about the length of the deposition: "You know, this man has already admitted to every one of these accusations. He admitted it before there was any proceeding against him. Then he went to arbitration and he admitted them again. And now you've got him to admit it a third time, but that isn't good enough for you." (Pl Dep, p 504.)

Contrary to Schaefer's assertions, the trial court did not apply the doctrine of collateral estoppel when it concluded that Schaefer failed to demonstrate an issue of material fact when it came to causation. In a reply brief, defendants had argued that Schaefer could not show the reasons for his termination were insufficient because "the decision was independently reached by Richard Reaume [the township supervisor], along with an independent arbitrator. In a footnote, defendants cited *Cole v West Side Auto Employees Fed Credit Union,* 229 Mich App 639; 583 NW2d 226 (1998) for the idea that the arbitrator's decision had collateral estoppel effect.

> Collateral estoppel bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding. The doctrine bars relitigation of issues when the parties had a full and fair opportunity to litigate those issues in an earlier action. A decision is final when all appeals have been exhausted or when the time available for an appeal has passed. [*Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006) (internal citations omitted).]

At the motion hearing, the trial court made a couple of comments that Schaefer misconstrues, including:

- "We're rehashing a little bit of the disciplinary proceeding here, and I'm not supposed [to] necessarily be revisiting that. I'm supposed to be assigned whether or not you've submitted sufficient evidence, Mike, under the WPA."

- "As it relates to the causal connections argument, it appears as though the plaintiff is attempting to relitigate that to which he's already admitted in the disciplinary proceeding which was independent."

- "The fact that the chief decided to enforce those violations in a department that appears to have been running rampant, again we can't attack the business decision of the arbitrator. The arbitrator dismissed on nonpretextual grounds."

However, it is clear from the entire transcript that the trial court did not believe that it was bound in any way by what occurred at arbitration or the arbitrator's conclusions. Instead, the trial court pointed to the fact that Schaefer *admitted* to much of the wrong-doing and that the arbitrator declined to upset the decision to terminate Schaefer where just cause existed for the termination. The trial court pointed to the arbitration decision as support for its conclusion that defendants had set forth legitimate non-retaliatory reasons for firing Schaefer and that Schaefer had failed to meet his burden of demonstrating that the proffered reasons were pretextual. The trial court stated: "The plaintiff hasn't met their [sic] burden to come back once that burden shifts to establish that this was a pretext even though the plaintiff cites to the timing aspect." The following exchange took place:

> MR. STEFANI [plaintiff's attorney]: So you're saying –
>
> THE COURT: What I'm saying –
>
> MR. STEFANI: -- that we don't have any – the arbitration had nothing to do with the Whistleblower case. It wasn't mentioned in the arbitration because the arbitration was arbitrating a labor contract.
>
> THE COURT: I understand.
>
> MR. STEFANI: And I'm not here to argue. I just want it clear on the record.
>
> THE COURT: Mr. Stefani, once the defendants have substantiated that there were legitimate reasons for the discharge, it's incumbent upon the plaintiff to respond to that burden shifting. The Court finds for those reasons stated on the record that the plaintiff has not, and the motion will be granted.

Moreover, the fact that Schaefer never raised his retaliation claim during the arbitration was further support that no such claim existed. Although Schaefer explained that he was simply too much of a stand-up guy to point fingers at other officers' behavior, it stands to reason that he would have raised a retaliation claim when his job was on the line.

Finally, there is no evidence that Schaefer received a harsher punishment than any other similarly situated officer. Both Linton and Albrecht resigned in lieu of being fired for their behavior while Schaefer was supposed to be supervising them. It is disingenuous for Schaefer to claim that he was somehow targeted when those other officers suffered similar fates. And as for claims of other officers' misconduct, even if what Schaefer and Albrecht said were true, the record is bereft of Tiderington having any knowledge of other officers' wrong-doing.

-9-

The trial court properly granted defendants summary disposition where Schaefer was unable to establish a prima facie WPA claim. Specifically, where defendants proffered legitimate, non-discriminatory reasons for firing Schaefer, Schaefer failed in his burden of bringing forth evidence that those reasons were merely pretextual.

Affirmed.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray