*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF DANIEL GEORGE TRUEBLOOD,

Plaintiff-Appellant,

v

P&G APARTMENTS, LLC,

Defendant-Appellee.

FOR PUBLICATION
March 12, 2019
9:05 a.m.

No. 340642
Wayne Circuit Court
LC No. 16-005626-NI

Before: O'BRIEN, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiff[1] appeals as of right the trial court's order granting summary disposition to defendant under MCR 2.116(C)(10). We affirm in part, reverse in part, and remand for further proceedings.

This slip-and-fall action arose after plaintiff slipped on a sidewalk located on the premises of defendant's apartment complex, where plaintiff was a tenant. On January 11, 2016, at around 11:00 a.m., plaintiff slipped on defendant's sidewalk, injuring himself.

Jeffrey Andresen, who has a PhD in climatology, prepared a report at plaintiff's request about the "meteorological and climatological records regarding the possible presence of snow and ice on the ground at" the subject property when plaintiff fell. Based on his review of the records, Andresen believed that approximately 3.4 inches of snow fell in the 24 hours before plaintiff's fall. According to Andresen, the snowfall combined with the conditions on paved surfaces at the subject property "would have resulted in a significant layer of ice (mostly refrozen slush) on the surface covered by a thin layer of drier, fluffy snow." Andresen testified that he based some of his conclusions on a combination of photographs[2] taken shortly after plaintiff fell and the records of the weather conditions around the time that plaintiff fell.

[1] Plaintiff died on or about December 19, 2016, from causes apparently unrelated to this action.

[2] The photos are included as part of the lower court record.

-1-

According to Andresen, it was "pretty clear" from the photos "that there [was] ice on the surface." Andresen believed that the photos showed "ice covering almost everything," which he said was "consistent with what the weather records suggest also."

Gregory Borg, the sole owner of defendant, testified that he does his own maintenance, snow removal, and deicing. Borg testified that he plows and uses a snowblower on the buildings, and "[s]ometimes [he has John] Suboch help [him]." Suboch confirmed that in January 2016, he would help Borg "remove the snow and throw out salt." Borg testified that to determine when snow removal was necessary, he "look[ed] at the news" and "[i]f it[ was] snowing out [he would] get out there that night or in the morning." He explained that he would "[u]sually go the night before and assess the situation and either salt it down, and then the next morning if there[ was] a big snowfall[,] plow or snow blow."

Borg testified that he was out at plaintiff's apartment "the night before" plaintiff fell because Borg "remember[ed that] there was a light dusting of snow[, a]nd [he] went out there and . . . threw some salt around the walkways, and [he] threw some in the parking lot." Borg estimated that he threw "a couple bags" of salt that night because that was "pretty much the norm" to "cover the area." Borg testified that he was also out at the subject property at around 9:00 a.m. on the day that plaintiff fell. According to Borg, he and Suboch "salted the property" and "[p]robably snow-blowed and maybe ran the plow over the parking lot a couple of times."

But several tenants of the subject property disputed Borg's testimony. Plaintiff testified that he never observed anyone doing snow or ice removal on the property on defendant's behalf. In fact, plaintiff said that he never saw Borg do any work at the premises, but did see another man doing maintenance. Anthony Lopenski, another tenant of the subject property, testified that it did not "really" look like there had been any snow removal on the day that plaintiff fell, it looked "snowy" to him, and "[t]here was no salt to be found" anywhere on the property that day. Kyla Nunley, another tenant of the subject property, testified that Borg "absolutely" had not salted before plaintiff fell, and that she did not see Borg or anyone else applying salt or plowing the premises the night before plaintiff fell. Nunley testified that she called Borg after plaintiff fell and saw Borg put salt down shortly "[a]fter the fact." Lopenski similarly testified that he did not see Borg doing any snow removal or deicing until after plaintiff left in the ambulance. Borg confirmed that he was at the apartment with Suboch after he was informed that plaintiff fell.

Plaintiff testified that on the morning that he fell, he was going to visit his attorney. According to plaintiff, he did not have any particular reason for going to see his attorney that day; it was simply "the day [he] chose." Plaintiff was aware that it had snowed the day before, and as he was leaving, "all [he] could see was a fine layer of snow . . . ." According to plaintiff, it was possible to get to his car by using a different doorway on the other side of the building, but he would not use that route because a person would still "have to walk around the front through the snow" to get to his or her car on the other side, and it "would be kind of lame to do that when you can just walk out the door [on the other side] and go to your car."[3] Borg confirmed that

---

[3] When defense counsel was confused about whether plaintiff was saying that "you can exit" through the second door, plaintiff clarified, "Oh, you can walk out the door."

tenants could use either entrance to access parking.

Plaintiff testified that when he used the door closest to where his car was parked, he took two or three steps and then fell. Plaintiff fell backwards "on [his] derriere." Plaintiff saw snow on the ground, but assumed that "ice underneath the snow" made him fall, though he "didn't see [ice] under the snow." Plaintiff clarified that he did not see any ice, but assumed it was there because "it was slippery" and he was wearing "the best boots you can buy" and he would not "have slipped on just snow." Plaintiff was not aware of anyone else ever falling on the property, and did not see anyone else slip on ice on the day that he fell.

Lopenski testified that he lived on the first floor of the subject property and that he saw plaintiff fall. When Lopenski saw plaintiff fall, he was sitting in his apartment in "a chair right by the window." Lopenski testified that he heard the door to the outside slam, then "looked over [and saw plaintiff's] arms go up and he disappeared." Lopenski testified that he went out to help plaintiff after he fell, and the sidewalk felt "[s]lippery." Lopenski assumed that it felt slippery because "it was icy." Lopenski later clarified that he did not see any ice, and that he just saw "a sheet of snow." But Lopenski double-downed on his testimony that there was ice beneath the snow, explaining that he "believe[d]" that there was a "real thin" layer of snow with "ice under there." Nunley, who was in Lopenski's apartment when he saw plaintiff fall, also went outside to the sidewalk after plaintiff fell. Nunley testified that the sidewalk where plaintiff fell was "real icy."

Plaintiff filed a complaint on May 3, 2016. The complaint alleged two counts. Count 1 alleged, in relevant part, violations of MCL 554.139, and Count 2 alleged premises liability.

On August 4, 2017, defendant filed a motion for summary disposition under MCR 2.116(C)(10). Defendant first addressed plaintiff's claim under MCL 554.139 that the sidewalk was not fit for its intended use. Defendant contended that plaintiff could not establish that the sidewalk was not fit for its intended use because he could "not even verify he fell on ice" and "could not say for sure that the ice caused his fall." Defendant also pointed out that Lopenski did not slip and fall on any ice, nor did the EMS workers, which established that other people were able to use the sidewalk for its intended purpose. Defendant also argued that the second portion of MCL 554.139—the duty "[t]o keep the premises in reasonable repair"—did not apply to common areas such as the sidewalk where plaintiff slipped.

Defendant then addressed plaintiff's premises liability claim. Defendant argued that the dangerous condition was open and obvious because plaintiff admitted "to seeing a layer of snow as he exited the building" and, "[g]iven that it was January in Michigan, a reasonable person would expect there to be other wintry conditions such as additional snow or even ice, and to be on the lookout." Defendant lastly argued that Andresen's testimony could not create a genuine question of fact because "all that can really be shown is that snow was likely present," and Andresen's testimony about ice "contradict[s] plaintiff's own testimony about the condition of the sidewalk." Defendant concluded that "the mere presence of snow does not establish the Defendant's fault."

Plaintiff filed a brief in opposition to defendant's motion on September 5, 2017. Plaintiff first argued that there was a genuine issue of material fact as to his theory of premises liability.

Plaintiff contended that the hazard was ice, and that the ice was not obvious because no one actually saw the ice; they only saw a thin sheet of snow. Alternatively, plaintiff argued that the ice was effectively unavoidable. According to plaintiff, he "had no other way of getting to his car than by traversing either the front (west) sidewalk or the rear sidewalk and parking areas, all of which were covered with the same frozen slush or sleet," so walking on ice was effectively unavoidable.

Turning to his statutory theories of liability, plaintiff first argued that the sidewalk that he slipped on was not fit for its intended use. Plaintiff argued that a sidewalk's intended purpose was for walking, and that it was not fit for its intended use if, as the evidence suggested, the sidewalk was icy and Borg had not salted the sidewalk before plaintiff fell. Plaintiff also contended that defendant failed to comply with a local law that required it to maintain its walkways "so as to afford safe passage" because it failed to timely remove the ice from the sidewalk.

On September 28, 2017, the trial court held a hearing on defendant's motion. After hearing the parties' arguments, which were in line with their briefs, the trial court granted summary disposition to defendant. On October 2, 2017, the trial court entered an order granting defendant's motion for summary disposition.

Plaintiff now appeals as of right.

Plaintiff argues that the trial court erred by granting defendant's motion for summary disposition. We agree that the trial court erred by granting summary disposition to defendant on plaintiff's claims for statutory violations under MCL 554.139, but disagree that the trial court erred by granting summary disposition to defendant on plaintiff's premises liability claim.

Appellate courts review de novo a trial court's grant of summary disposition. *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016). Defendant moved for summary disposition under MCR 2.116(C)(10). In *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999), our Supreme Court explained the standard for a motion under MCR 2.116(C)(10) as follows:

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law.

A genuine issue of material fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

"In a premises liability action, a plaintiff must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages." *Benton v Dart*

*Properties, Inc*, 270 Mich App 437, 440; 715 NW2d 335 (2006). The duty that a landlord owes a plaintiff depends on the plaintiff's status on the land. *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000). A tenant is an invitee of the landlord. *Id.* at 604, 614. Thus, a landlord owes a duty to a tenant "to exercise reasonable care to protect the [tenant] from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 516; 629 NW2d 384 (2001). Absent special aspects, this duty does not extend to open and obvious dangers. *Id.* at 516-517. "Generally, the hazard presented by snow and ice is open and obvious, and the landowner has no duty to warn of or remove the hazard." *Buhalis v Trinity Continuing Care Services*, 296 Mich App 685, 694; 822 NW2d 254 (2012), quoting *Royce v Chatwell Club Apartments*, 276 Mich App 389, 392; 740 NW2d 547 (2007) (quotation marks omitted).

Here, plaintiff contends that he slipped on ice, and that he did not see the ice because it was covered by a thin sheet of snow. In response, defendant contends that because neither plaintiff nor any other witness testified that they actually saw ice, there is no evidence that there was any ice that plaintiff slipped on. In our opinion, defendant's contention does not view the evidence in the light most favorable to plaintiff. Plaintiff testified that although he did not see the ice, he believed that he slipped and fell on ice. This was supported by Lopenski's testimony, who testified like plaintiff that he believed that there was ice underneath the snow. Both Lopenski and plaintiff explained that their belief was premised on the fact that it was "slippery." Although, like plaintiff, Lopenski did not see any ice, this goes to the weight of their testimonies about the ice, not to whether there was in fact ice on the sidewalk. Also of note, both Lopenski's and plaintiff's testimonies are supported by Nunley, who testified that that the sidewalk where plaintiff fell was "real icy."

While this may be a close question if the only evidence was a person's belief that there was ice, there is additional evidence to support that the sidewalk was icy: the testimony of Andresen. Andresen explained that the conditions were such that ice was likely to form. Looking at photos of the scene after the accident, Andresen opined that the entire area was covered with "frozen slush"—consistent with what Andresen expected—and that it would be slippery. Viewing this evidence in the light most favorable to plaintiff, it would tend to confirm plaintiff's and Lopenski's testimonies that plaintiff slipped on ice. Thus, we conclude that, when viewing the evidence in the light most favorable to plaintiff, a rational trier of fact could find that plaintiff slipped on ice on the sidewalk in defendant's apartment complex.

Even if plaintiff slipped on ice, there is no question that the ice was open and obvious. In *Ragnoli v North Oakland-North Macomb Imaging, Inc*, 500 Mich 967 (2017), our Supreme Court reversed a panel of this Court that found a question of fact whether ice in a parking lot with low lighting at night was open and obvious. See *Ragnoli v North Oakland-North Macomb Imaging, Inc*, unpublished per curiam opinion of the Court of Appeal, issued April 12, 2016 (Docket No. 325206), p 2. Our Supreme Court explained that

> notwithstanding the low lighting in the parking lot, the presence of wintery weather conditions and of ice on the ground elsewhere on the premises rendered the risk of a black ice patch open and obvious such that a reasonably prudent person would foresee the danger of slipping and falling in the parking lot. [*Ragnoli*, 500 Mich at 967 (citation and quotation marks omitted).]

Here, the weather conditions when plaintiff fell were clearly wintry. Andresen explained that it had snowed over three inches in the 24 hours before plaintiff went out and that it was well below freezing when plaintiff stepped outside. Indeed, plaintiff acknowledged that it snowed the night before and testified that he was wearing winter clothing and winter boots when he left his apartment, showing that he was well aware of the wintery conditions outside. And both plaintiff and Lopenski testified that they saw a layer of snow on the sidewalk when they walked outside. Thus, because snow and ice are generally open and obvious, *Buhalis*, 296 Mich App at 694, plaintiff readily saw the snow, and "the presence of wintery weather conditions" would alert "a reasonably prudent person" to "the danger of slipping and falling," *Ragnoli*, 500 Mich at 967, the ice that plaintiff slipped on was open and obvious.

Plaintiff argues that even if the ice was open and obvious, his premises liability claim is not barred because there is a question of fact whether the ice was effectively unavoidable. See *Hoffner v Lanctoe*, 492 Mich 450, 463; 821 NW2d 88, 96 (2012) ("This Court has discussed two instances in which the special aspects of an open and obvious hazard could give rise to liability: when the danger is *unreasonably dangerous* or when the danger is *effectively unavoidable*."). In *Hoffman*, our Supreme Court explained that "the standard for 'effective unavoidability' is that a person, for all practical purposes, must be *required* or *compelled* to confront a dangerous hazard," so "situations in which a person has a *choice* whether to confront a hazard cannot truly be unavoidable, or even effectively so." *Id*. at 469.

The danger here was not effectively unavoidable. Plaintiff had access to another door that he could have exited out of to go to his car. Thus, because plaintiff had a choice whether to confront the hazard, it was not effectively unavoidable. See *id*.

Plaintiff argues that the ice was unavoidable because it covered both entrances. Plaintiff bases this assertion on the testimony of Andresen, who said that the weather conditions created an icy condition across a large stretch of the Detroit metropolitan area. However, contrary to plaintiff's assertion, there is no evidence that the other entrance was covered in snow and ice. Andresen's testimony that many areas would have been icy is not sufficient to establish that the other entrance would have been icy. Such a conclusion would be speculation or conjecture—"an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference." *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994) (quotation marks and citation omitted). While the other entrance being covered with ice would be consistent with Andresen's testimony that much of the Detroit metropolitan area was covered with ice, there is no way to reasonably infer that, because parts of the area were covered in ice, then the other entrance was icy. Speculation cannot create a question of fact. *Detroit v General Motors Corp*, 233 Mich App 132, 139; 592 NW2d 732 (1998).

Turning to plaintiff's second argument, he contends that the trial court erred by dismissing his claim based on the statutory violations under MCL 554.139(1)(a) and (b). The open and obvious doctrine "is not available to deny liability" for a statutory violation under MCL 554.139(1). *Benton*, 270 Mich App 441.

MCL 554.139(1)(a) states:

(1) In every lease or license of residential premises, the lessor or licensor covenants:

(a) That the premises and all common areas are fit for the use intended by the parties.

In *Allison*, 481 Mich at 428-431, our Supreme Court addressed the analytical framework that is to be used when determining liability under MCL 554.139(1)(a). First, the court is to determine whether the area in question is a "common area." Then, the court is to identify the intended use of the common area. Lastly, the court must determine if there could be "reasonable differences of opinion regarding" whether the conditions made the common area unfit for its intended use.

Plaintiff here slipped on a sidewalk leading from his apartment building to the parking lot. In *Benton*, 270 Mich App at 443, this Court held that "sidewalks constituted common areas used by tenants." The *Benton* Court explained:

First, sidewalks such as the one in question are located within the parameters of the apartment structure. They are constructed and maintained by the landlord or those in the landlord's employ. Second, sidewalks leading from apartment buildings to adjoining parking lots are common areas for tenants because all tenants who own and park their vehicles in the spaces allotted to them by their landlord rely on these sidewalks to access their vehicles and apartment buildings. Additionally, any person residing in an apartment complex must utilize the sidewalk provided by the landlord every time the tenant wishes to enter or exit his or her dwelling. [*Id*. at 442-443.]

We conclude that the rationale for finding that the sidewalk in *Benton* was a common area applies to the sidewalk here, so the sidewalk that plaintiff slipped on was a "common area" under MCL 554.139(1)(a).

Next, like in *Benton*, the intended use of the sidewalk here was "walking on it." *Id*. at 444. The only remaining question is whether the presence of ice on the sidewalk made it unfit for its intended use. In *Benton*, this Court held that "a sidewalk covered in ice is not fit" for its intended use. *Id*. But in *Allison*, our Supreme Court explained that ice does not inherently render a common area unfit for its intended use if the ice is a "[m]ere inconvenience." *Allison*, 481 Mich at 730. Yet, here, there is a question of fact whether the sidewalk was completely covered with ice, making the ice more than a mere inconvenience. Plaintiff testified that the sidewalk was covered with snow and was slippery. Lopenski similarly testified that there was snow over the sidewalk and that it was slippery. And Andresen testified that the weather conditions leading up to plaintiff's fall would have coated the entire area with ice, and that, based on the pictures taken after the accident, the entire area appeared coated with ice with some snow overtop, which is what Andresen would have expected. Viewing this evidence in the light most favorable to plaintiff, there is a question of fact whether the sidewalk was completely covered with ice. We conclude that a sidewalk completely covered in ice is not fit for its intended use, see *Benton*, 270 Mich App at 444, because it does not present a "[m]ere inconvenience of access," *Allison*, 481 Mich at 430; anyone walking on a sidewalk completely covered in ice would be forced to walk on ice, and there is no way to simply walk around it.

-7-

Defendant contends that, based on *Allison*, plaintiff's claim should fail because he cannot establish that the sidewalk was not fit for its intended use. In *Allison*, 481 Mich at 423, the plaintiff slipped and fell while walking to his car. Plaintiff's car was parked in the defendant apartment complex's parking lot, and plaintiff fell after he slipped on ice that was covered by one to two inches of snow. *Id*. The Court held that a parking lot was a common area, and part of a parking lot's intended use was to allow tenant's reasonable access to their parked vehicles. *Id*. at 429. Our Supreme Court held that the plaintiff failed to establish a question of fact whether the parking lot was fit for this intended use because his "allegation of unfitness was supported only by two facts: that the lot was covered with one to two inches of snow and that [he] fell." *Id*. at 430.

Relying on *Allison*, defendant argues that plaintiff cannot establish that the sidewalk was not fit for its intended use because "the only evidence presented that the sidewalk did not allow residents access to their vehicles was the presence of ice and snow and [plaintiff's] fall." But this argument misconstrues *Allison*'s holding. *Allison* does not stand for the notion that evidence of ice cannot make a sidewalk unfit for its intended use. This would require overruling *Benton*, which *Allison* did not do. Rather, *Allison* stands for the proposition that a plaintiff must present more evidence than simply the presence of ice or snow and someone falling. And here, plaintiff did that. As already explained, there is a question of fact whether the sidewalk was *completely* covered in ice. Thus, if plaintiff walked on the sidewalk, he was inevitably going to confront the ice. Because the purpose of a sidewalk is walking, and ice is slippery and not easy to walk on, a sidewalk that is completely covered in ice is not fit for its intended use. See *Benton*, 270 Mich App at 444.

Defendant also argues that plaintiff failed to establish a genuine issue of material fact because uncontested testimony established that others—namely Lopenski and the EMS workers—were able to walk on the sidewalk without falling. While this would tend to support that the sidewalk was fit for its intended use, it does not overcome the other evidence. Namely, if the sidewalk was completely covered in ice, then it was not fit for its intended use. That others were able to walk on the sidewalk without incident could suggest that the sidewalk was not completely covered in ice, but it could also suggest that the others were walking more carefully on the sidewalk because, seeing as plaintiff had slipped, they were aware that it was slippery.

Because there is a question of fact whether the sidewalk was fit for its intended use, the next question is whether defendant breached its duty under MCL 554.139(1)(a). See *Benton*, 270 Mich App at 444. Again, the duty that defendant owed plaintiff under MCL 554.139(1)(a) was "to maintain the sidewalk in a manner that was fit for its intended use." *Id*. Borg testified that he salted the night before plaintiff fell and began salting the next morning at 9 a.m.—two hours before plaintiff fell. Yet the three tenants testified that no one came out and salted the morning of plaintiff's fall. Viewing this evidence in the light most favorable to plaintiff, reasonable minds could differ on whether anyone salted the sidewalk on defendant's behalf before plaintiff fell. If no one salted the sidewalk, then defendant would have breached its duty to maintain the sidewalk in a manner fit for its intended use.

Plaintiff also argues on appeal that defendant breached its statutory duty under MCL 554.139(1)(b), which states:

(1) In every lease or license of residential premises, the lessor or licensor covenants:

* * *

(b) To keep the premises in reasonable repair during the term of the lease or license, and *to comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located*, except when the disrepair or violation of the applicable health or safety laws has been caused by the tenants wilful or irresponsible conduct or lack of conduct. [Emphasis added.]

Plaintiff contends that defendant breached Wyandotte Ordinance § 19-288(c), which requires that "[s]teps, walks, driveways, parking spaces and similar paved areas shall be maintained so as to afford safe passage under normal use and weather conditions."

Our Supreme Court in *Allison* addressed MCL 554.139(1)(b), but at issue in *Allison* was the first part of MCL 554.139(1)(b)—the covenant "[t]o keep the premises in reasonable repair during the term of the lease or license[.]" It was this covenant that *Allison* held did not apply to common areas, see *Allison*, 481 Mich at 432 (explaining "that the covenant to repair under MCL 554.139(1)(b) does not apply to 'common areas' "), and this covenant that the Court held did not apply to the accumulation of snow and ice, see *id*. at 434 (explaining that "repairing a defect equates to keeping the premises in a good condition as a result of restoring and mending damage to the property," and because "[t]he accumulation of snow and ice does not constitute a defect in property, . . . the lessor would have no duty under MCL 554.139(1)(b) with regard to snow and ice, except to the extent that such snow and ice caused damage to the property"). Based on our reading of *Allison*, it is clear that *Allison*'s holding only applied to the covenant to make reasonable repairs, not to the covenant to comply with local health and safety laws.

Because the covenants are listed together and not separated (like the covenant to keep common areas fit for their intended use is separated), there may be a possibility that the Legislature intended for both the covenant to make reasonable repairs and the covenant to comply with local health and safety laws to be read together—meaning that the limitations on the covenant to make reasonable repairs also applies to the covenant to comply with local health and safety laws. A plain reading of the statute, however, forecloses this possibility. The covenants are separated by a comma and the word "and." The word "and" serves as a conjunction to separate the landlord's covenant to make reasonable repairs to the premises from the landlord's covenant to comply with applicable health and safety laws.

Nothing in the statute suggests that both of these covenants are to be read together. For instance, if the Legislature intended for both covenants to be limited to the premises (in exclusion of common areas), it would have written the statute to reflect that. But the statute is not written in such a way, and instead reflects that a landlord is "to comply with the applicable health and safety laws" of the local government. Thus, based on the statute's text, the covenant to make reasonable repairs appears distinct from the covenant to comply with local health and safety laws.

This reading of the statute is also supported by the fact that the covenant to make reasonable repairs has historically been considered distinct from the covenant to comply with local health and safety laws. In *Rome v Walker*, 38 Mich App 458, 462; 196 NW2d 850 (1972), this Court, while discussing MCL 554.139(1)(b), referred to the *covenants* (plural) "to repair and comply with safety laws" as being "one of statutory mandate." While the issue of whether these covenants were separate was not squarely before the *Rome* Court, the Court's language is telling and supports that the covenant to make reasonable repairs is distinct from the covenant to comply with local health and safety laws.

For these reasons, we conclude that a landlord's covenant to comply with local health and safety laws is distinct from its covenant to make reasonable repairs. MCL 554.139(1)(b) plainly states that the landlord covenants "to comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located[.]" The premises here are located in Wyandotte, Michigan. Thus, defendant had a duty to comply with Wyandotte Ordinance § 19-288(c), which requires that "[s]teps, walks, driveways, parking spaces and similar paved areas shall be maintained so as to afford safe passage under normal use and weather conditions." Because there is a question of fact whether the sidewalk that plaintiff slipped on was completely covered in ice, there is a question of whether defendant breached its duty "to afford safe passage under normal use and weather conditions" to plaintiff while he was using the sidewalk.[4] And, for the reasons explained above, there is a question of fact whether defendant breached this duty by failing to salt the sidewalk. If defendant breached this duty, then reasonable minds could conclude that this breach caused plaintiff to slip and fall, and there is no question that plaintiff suffered injuries. The trial court erred by granting summary disposition to defendant on his statutory violation under MCL 554.139(1)(b).

Affirmed in part, reversed in part, and remanded for further proceedings.

/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause

---

[4] We expressly limit our ruling to finding a question of fact whether the sidewalk afforded plaintiff "safe passage." We offer no opinion whether the "weather conditions" were "normal" before plaintiff slipped, because that question has not been raised by the parties.